## Case No. 3,012.

COLLINS et al. v. The FORT WAYNE.

[1 Bond, 476.]¹

District Court, S. D. Ohio. Oct. Term, 1861.

SALVAGE AGREEMENT—VALIDITY — COMPENSATION —WAGES—REPAIRS—SUPPLIES — DOMESTIC VESSEL — SUBROGATION OF INSURANCE COMPANY — PRIORITY OF LIENS.

1. A salvage service, in raising and preserving a steamboat sunk in the Mississippi river, has a priority of lien over claims for wages earned and supplies furnished before the accident.
[Cited in The Lady Boone, 21 Fed. 733.]

2. A salvor is favored in law, on the assumption that without his service the res might have been wholly lost.

3. If the salvage service is rendered under a previous special agreement, fairly made, stipulating for a compensation contingent on the success of the salvor's efforts, it will be recognized in admiralty as creating a valid lien.

4. But if there are prior lien-holders, not parties to such agreement, they are not concluded as to the amount of compensation agreed to be paid, and a court of admiralty may inquire into the reasonableness of the compensation, and make such allowance as may be equitable.

---

¹ [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

5. The lien of seamen for wages earned prior to the accident is not absolutely extinguished thereby, but continues subject to the salvor's lien.

6. The salvage agreement having stipulated for a compensation of twenty-five per cent. on the value of the boat, assumed in the policy of insurance at $18,000. and it appearing that the actual value did not exceed $9,000, the sum claimed for salvage is unreasonable, under the circumstances of the case, and subject to reduction by the court.

7. An insurance company having paid their quota for the salvage service, and having made advances for the necessary repairs of the boat after being raised, the owners having no means or credit by which to make the repairs, have a maritime lien at least to the extent of such repairs.

8. A due-bill given by the master in the name of the owners for the amount of such repairs, reciting that they were necessary, and that the advances therefor were on the credit of the boat, is conclusive on the owners, unless impeached for fraud, and constitutes a valid lien.

9. Claims for wages earned after the boat was repaired, have an equality of lien with that for advances made for repairs.

10. The Fort Wayne having been enrolled at Cincinnati as of that place, and two of the owners residing in the state of Ohio, one of whom was the managing owner, the boat was properly enrolled there, and that was the home port of the boat, although a majority of the owners resided in the state of Pennsylvania, and claimants, therefore, for stores and supplies furnished at Cincinnati have no lien on the boat therefor.
[Cited in The Rapid Transit, 11 Fed. 329.]

11. Debts incurred in building a boat are presumed to be based on the personal credit of the owners, and do not import a maritime lien. And this doctrine is not affected by the fact that such debts are declared to be a lien by the law of the state in which the boat was built.

In admiralty.

Lincoln, Smith & Warnock, for libellants.
Dodd & Huston, for respondents.

OPINION OF THE COURT: The status of this case, with the numerous and somewhat complicated questions involved, will be sufficiently intelligible from the following brief statement. On April 16, 1861, at the instance of Charles H. Collins, the libellant, the steamboat Fort Wayne, was arrested at the port of Cincinnati by process from this court. The claim of Collins, as set forth in his libel, is for stores and supplies furnished on the credit of the boat at Pittsburg, in the state of Pennsylvania, from June 20, 1859, to January 28, 1861. Subsequently to the seizure of the boat, numerous interveners have filed claims, which, without reference to any question of the priorities of their liens, may be classified under the following heads: (1) Wages earned before the sinking and repair of the boat; (2) wages earned subsequently; (3) stores and supplies furnished at Pittsburg, Cincinnati, Cairo, and St. Louis, both before and after the boat was sunk; (4) lighterage, and the hire of a tow-boat at Louisville; (5) building debts incurred at

Pittsburg; (6) salvage service by the Missouri Wrecking Company in raising the boat; (7) repairs by the Eureka Insurance Company after the boat was raised. By an interlocutory decree of this court, entered April 23, 1861, the boat was sold at public sale by the marshal, at Cincinnati, for $3,650, which sum has been paid into the registry, subject to the order of the court for its distribution. And by agreement of the proctors of the parties, the claims for wages accruing after the boat was raised, repaired, and fitted for navigation, have been paid. There yet remains in the registry about $2,500, for distribution to the claimants as their rights and priorities may be determined by the court.

The first claim to be considered will be that of the Missouri Wrecking Company. And one of the questions involved in it is, whether it has a priority of lien over claims arising prior to the salvage service rendered by that company. In their libel, they allege, in substance, that on February 20, 1861, the Fort Wayne, in a trip from New Orleans to Cincinnati and Pittsburg with a large cargo, struck a log in the Mississippi river, near the foot of Island No. 16, and was so injured thereby as to sink and become a total wreck; that the owners and underwriters, being unable to save the boat or cargo, requested the Missouri Wrecking Company to take possession of the wreck and the cargo as salvors, and, if practicable, to save the same, agreeing to pay the company twenty-five per cent. on the value of the boat, estimated in the policy of insurance at $18,000; that the company, by its agents, immediately repaired to the wreck with their boats and machinery, and began their operations the 24th of February, and on the 6th of March had succeeded in raising the boat and a good part of the cargo, and on the 18th of March delivered the boat at Mound City, near Cairo, for repairs. The libel of the wrecking company also alleges that the company is a corporation with a large capital invested in boats and machinery for saving wrecked boats and their cargoes; prepared, equipped, and manned for such service, and of little value for any other purpose; and that the Fort Wayne could not have been raised or saved by any other agency. It is also averred that the charge of the company is reasonable, and in accordance with their usage, and that there is now due them for their services the sum of $1,500, for which they ask a decree.

Without reciting the evidence proving the salvage service rendered by the wrecking company, it will be sufficient to say that it fully sustains all the material allegations of their libel. It is proved that one of the boats of the company, called the Submarine No. 7, fitted out with powerful pumps, diving-bells, and all other necessary appliances, with a full complement of officers and hands, repaired to the wreck of the Fort Wayne, upon the application of Capt. Barr, the master of that boat, and that a contract for raising the wreck, and saving the cargo, was signed by him in behalf of the owners and insurers, by which the company, if successful, were to be paid twenty-five per cent. on the value of the boat as estimated in the policy of insurance. It is also clearly proved that from the situation of the wreck there was danger of its immediate destruction, and the consequent loss of the entire cargo. The deck of the boat was badly twisted and strained, and there was a large hole or opening in its side; and as the current was swift, and the river rapidly rising at the time, the witnesses agree in saying the boat would have gone to pieces in a short time, and, with the cargo, would have been a total loss. It is also proved that the company were occupied in the service from the 24th of February until the 6th of March, and that the actual expense of raising the boat, and delivering it, with the cargo, at Mound City, was not less than $2,000. It also appears that the value of the cargo saved, from actual sale, was $6,761, and that by the contract the company were to receive thirty per cent. on the value, making $2,028, which, with the twenty-five per cent. on the estimated value of the boat—$18,000 —made an aggregate for salvage service of $6,528. Of the $4,500 claimed by the company for raising the boat and taking it to Mound City, they admit the payment of $3,000, leaving a balance now claimed as unpaid of $1,500. These are all the material facts connected with the alleged salvage service which it is necessary to notice. On these facts, it is insisted by the proctor, who resists the allowance of this claim: 1. That this is not a salvage service, and that the wrecking company are not salvors in the sense of having a priority of lien, for the reason that the service was rendered under a special agreement between the parties. 2. That if there was a meritorious salvage service, the sum claimed is unreasonably large, and that the equity of the case requires its reduction. It may be remarked here that it does not admit of doubt, nor is it controverted in this case, that if there has been a salvage service rendered by the wrecking company within the meaning of the maritime law, it imports a lien in their favor which has priority over claims for wages earned, or supplies furnished, before the sinking of the boat. This is well-established law, and has its basis in obvious principles of justice and reason. Meritorious salvors stand in the front rank of privilege, and the rights of those having liens before the salvage service must be secondary to those having a salvage claim. This principle is well stated in Coote's Admiralty Practice. The author says, page 116: "The suitor in salvage is highly favored in law, on the assumption that, without his assistance, the res might have been wholly lost.

The service is, therefore, beneficial to all parties having either an interest in, or a claim to, the ship and her freight and cargo." And again, page 117, it is laid down, that "salvage is privileged before the original or prior wages of the ship's crew, on the ground that they are saved to them as much as, or eadem ratione qua, the ship is saved to the owners." This doctrine is so well settled, both by the English and American authorities, that it is useless to multiply citations.

I proceed, therefore, to notice the question whether there can be a salvor's lien or a salvor's compensation, if the service has been rendered under a special contract. There would seem to be no doubt on this point, but as it has been controverted in the argument, I will refer to some of the authorities bearing upon it. These clearly settle the doctrine, that it is not less a salvage service, if performed under an agreement to pay and accept a stipulated sum, if the service is successful. In Flanders on Maritime Law, page 331, it is said: "Where there has been a definite, distinct agreement, with ample time for the parties to consider what they are doing, and no advantage has been taken of the circumstances of distress in which one party is placed, such an agreement, so entered into, a court of admiralty will not disturb." And in Conkling's United States Admiralty (vol. 1, p. 351), the author says: "Neither is it important whether the service was rendered spontaneously or by request; or, whether in a case of a previous contract, the rate or amount of compensation for the labor and services to be performed was agreed upon, or left to be determined by the quantum meruerunt. The service, whether rendered spontaneously or by request, is a salvage service, and the contract, if there is one, is a salvage contract, and the compensation a salvage compensation." In the case of The Emulous [Case No. 4.480], Judge Story says on this subject: "I take it to be very clear * * * that when the service has been rendered under circumstances which establish that the parties have voluntarily, and without any controlling necessity on the side of the proprietors of the property saved, or their agents, entered into a contract for a fixed compensation, or upon the ordinary terms of a compensation for labor and services quantum meruerunt, in either case it does not alter the nature of the service as a salvage service, but only fixes the rule by which the court is to be governed. It is still a salvage service and a salvage compensation." The same doctrine is distinctly asserted in the case of The Independence, [Id. 7,014,] in which the learned judge says: "I do not intend to be understood, however, that a case, in which a contract exists, may not also be a case of salvage. The parties may agree on the amount of a salvage compensation, or on the principles on which it shall be adjusted; and such agreements fairly made, no advantage being

taken of ignorance or distress, are readily upheld by courts." The exception to this rule, stated by the learned judge in the same case, is what it is stipulated in the contract, that the party rendering the service shall receive a fixed sum, whether the property is lost or saved. Such a contract will not be recognized by a court of admiralty as importing a maritime salvage service. And in the case of The True Blue, 9 Eng. Adm. R. [2 W. Rob. Adm.] 177, the court state the law on this subject as follows: "Now, I entertain no doubt whatever that an agreement of this description can be legally made between the master of a vessel in distress and persons affording salvage assistance: provided, there be a clear understanding of the nature of the agreement; that it is made with fairness and impartiality to all concerned; and that the parties to it are competent to form a judgment as to the obligations to which they are binding themselves. Such an agreement, I feel no hesitation to pronounce, would be a binding instrument, not to be disturbed by the judgment of this court."

Without referring to other authorities on this point, it seems to be well-settled law that a special agreement for a salvage service, under the conditions above stated, will be regarded as valid in a court of maritime jurisdiction. But it is still a question arising from the posture of this case, whether other persons not parties to the agreement, but parties in interest, are concluded by it in respect of the sum agreed on as the compensation for the salvage service. The agreement is signed by the master of the Fort Wayne for the owners and underwriters, and by the wrecking company. So far as their interests are concerned, in the absence of circumstances invalidating the entire agreement, the court might well hesitate to interfere with the amount of compensation stipulated to be paid. But there are seamen, not parties to that agreement, who have claims for wages earned prior to the accident to the boat; and as to these, equity requires they should not be placed in a worse condition than they would be if the salvage service had been spontaneous and not by special agreement. It is the obvious duty of the court to protect their interests as far as it may be practicable. They have an unquestioned superior lien for their wages prior to the sinking of the boat; and their lien, though suspended by that accident, revived and attached after the boat was raised and repaired, subject to the lien of the salvors, and those who made the advances for repairs. In other words, if the claims for salvage and repairs were less than the fair value of the boat after being raised and repaired, the prior lien-holder would have a legal claim to the extent of such difference. Now, the evidence is that in February, 1861, when this accident occurred, the Fort Wayne was worth from $8,000 to $9,000, and that after being raised and repaired, even in the depressed condition of the steamboat busi-

ness at that time, it would have sold at Cairo for about $6,000. This statement shows conclusively, that allowing a fair compensation for the salvage service and the repairs, there was something to which the prior lien for wages could attach.

The argument urged against this view is, that when the Fort Wayne rested as a mere wreck on the bottom of the Mississippi, it was wholly valueless, and could not therefore be the subject of a lien. True, the admitted doctrine of the maritime law is, that freight is the mother of wages; and where there has been a total destruction of a vessel, there is no res to which the seaman's lien can attach, and there can therefore be no proceeding in rem. But it is equally well settled, that if any part of the vessel is saved, this lien adheres to it, even to the last plank. And, if the wreck is restored and rendered valuable, the lien exists, subject to the superior lien of those by whose labor or money the value has been created. The following are some of the authorities which affirm this principle: 1 Hagg. Adm. 227; 9 Eng. Adm. R. 120; 7 Law Rep. 522 [The Massasoit, Case No. 9,260]; 1 Newb. Adm. 195 [Bruce v. The America, Id. 2,046]; 2 Pars. Mar. Law, 591; 2 Conk. Adm. 105, 106. I can not hesitate in the conclusion, that the accident by which the Fort Wayne was sunk, affected only sub modo the rights of those having prior liens, not being parties to the salvage agreement. So far as this agreement assumes a valuation of the boat, and fixes a rate of compensation based on such valuation, the court may inquire whether from the facts in proof, the compensation for the salvage service is fair and equitable. In this inquiry, I have no desire to deprive these salvors of a liberal reward for their labors in the rescue and preservation of this property. Meritorious suitors in salvage have a favorable standing in maritime courts, and it certainly has not been the error of those courts that their allowances for salvage services have been meted out with a stinted or niggardly hand. And it must be conceded, there are features in the service rendered by the wrecking company calling for a liberal allowance. It is worthy of remark, however, that the liberal spirit which has actuated judges and courts in their action on salvage claims had its origin in cases connected with the commerce and navigation of the ocean, which generally involves severe toil and exposure and great peril of life. Where these elements of the service are apparent, the great interests of commerce and a laudable appreciation of heroic actions often demand a rate of compensation bearing no proportion to the time occupied or the labor performed in the service. But in this case, these features of a salvage service do not appear. The service was performed on the Mississippi river, and did not involve the usual hazards of a service on the ocean. Yet it was effective and valuable, and in some of its aspects

justifies a liberal allowance to the salvors. The Missouri Wrecking Company has been incorporated by an act of the legislature of Missouri. Their object is to save boats and other property in peril on the Ohio and Mississippi rivers for compensation. The company have a capital of $200,000, and have provided at a heavy expenditure of money the necessary boats and machinery for the prompt and effective prosecution of their business. It has been in existence some years, and has had a virtual monopoly of the wrecking business since it has been in being. Though the main object of the stockholders doubtless is their pecuniary profit, their operations have been greatly beneficial to the commerce of the west. Their expensive boats and machinery are admirably adapted to rescue property from loss and destruction; and in many cases they have been successful where all other agencies would fail. In the case of the Fort Wayne, the evidence makes it certain that the boat and cargo would have been a total loss but for the means used for their rescue. Ten days of arduous labor, involving doubtless some hardships and some peril of life, were occupied in raising the boat and securing the cargo. There was an actual outlay in the performance of the service of not less than $2,000. Added to this, it may be noticed that the compensation was contingent on the success of their efforts to save the property.

But giving due weight to these facts, I can not resist the conviction, that as between those having prior liens and the wrecking company, the amount claimed and due by the strict terms of the agreement exceeds a just remuneration for the service. The agreement, as before stated, assures to the company twenty-five per cent. on the valuation of the boat, which is assumed in the policy of insurance at $18,000, and thirty per cent. on the value of the cargo, ascertained by actual sale to have been $6,761. The result will appear from the following statement:

25 per cent. on $18,000 is............ $4,500
30 per cent. on $6,761................ 2,028
                                      ─────────
    Making an aggregate of.......... $6,528

This sum is unreasonably large for the service rendered. That its allowance is inequitable will clearly appear from the fact that the result produced by the literal terms of the agreement, is based on a false and fictitious value of the Fort Wayne. The agreement assumes the value of the boat to be $18,000, whereas the weight of testimony proves clearly that its actual value at the time of the accident did not exceed $8,000 or $9,000, and that when raised and repaired, the boat at Cairo would probably have sold for about $6,000. It thus appears that $4,500, claimed for salvage on the boat, is one-half of its highest estimated value, in ordinary times, and more than two-thirds the amount for which it would have sold after being

raised and repaired. If to this is added upward of $2,000, paid to the wrecking company for saving the cargo, it will be obvious that their claim for their service is greatly too large. And justice to the prior lien-holders will not sanction the allowance of the whole claim of $4,500 as salvage in raising the boat. Of this sum, it seems $3,000 have been paid by the underwriters, leaving a balance as claimed of $1,500. I might, perhaps, be fully justified in refusing to allow any part of this balance, but desiring to act in a spirit of great liberality, I will reduce the sum claimed one thousand dollars only, and render a decree in favor of the wrecking company for $500.

The next claim is that of the Eureka Insurance Company of Pittsburg, in the state of Pennsylvania, for $1,500. This claim is for money advanced for repairs to the Fort Wayne after being raised and taken to Mound City. The libel of the insurance company sets forth, in substance, that these repairs were indispensable, and without them the boat was useless; that the owners had no means to make them, and no credit on which they could have procured them to be made; that they advanced the money, not on the credit of the owners, but on the credit of the boat; and that the master gave a due-bill for the amount, expressly stating that they were made on the credit of the boat. The libellants claim that they have a lien on the boat for this money, and ask for a decree for the amount. The due-bill given for the repairs is one of the exhibits in the case. It bears date at Cairo, April 11, 1861, and recites that the $1,500, for which it was given, was "for money advanced for repairs to the boat after being raised; the same being necessary to enable her to reach Cincinnati, and advanced on the credit of the boat." It is signed, "Steamboat Fort Wayne and owners, by Samuel Barr, Jr., Master." It is insisted that this due-bill imports a lien on the boat, having priority next to that of the Missouri Wrecking Company, as a claim for repairs in the nature of salvage repairs, indispensable to the further service of the boat, made expressly on its credit in a state other than that in which its home port is situated. This is controverted on the ground: 1. That the funds were advanced and the repairs made without the assent of the owners, who are not, therefore, concluded by the due-bill signed by the master, and that the same does not create a maritime lien on the boat. 2. That the advances for repairs by the Eureka company were made for their benefit, and in discharge of their liability to the owners as insurers of the steamboat.

I do not propose to examine at length the first point. I suppose the proposition is incontrovertible, that he who lends or advances money at a port or place in a state, to which the boat or vessel does not belong, for repairs necessary to the successful prosecution of its business, has a lien, for the enforcement of which he may proceed in rem. A very respectable elementary writer says: "A person who lends money to be employed in the repairs of a vessel, or to furnish her with supplies, has the same privilege against the vessel and freight that material-men have. He is considered as giving credit both to the ship and to the owners. The ship is hypothecated to him for his security, and he may maintain in the admiralty, either a libel in rem against the vessel and freight, or in personam against the owner." Flanders' Mar. Law, § 239. The same doctrine is distinctly asserted in the case of Davis v. Childs [Case No. 3,628], and by other American cases, to which it is not necessary specially to refer. The due-bill given by the master, which has been already noticed, contains all the facts necessary to clothe this claim with the requisites of a maritime lien. It states explicitly that the repairs were not only necessary, but that the advances made for that purpose were made on the credit of the boat. Prima facie, the boat was bound for these advances. The due-bill may be impeached for fraud, but there is nothing in the evidence from which the inference of fraud can be deduced. If the oral evidence of the master were admissible to contradict the facts stated in the due-bill, it would not establish such a conclusion. On the contrary, all the proofs in the case sustain the fairness and validity of the due-bill. The Fort Wayne was so seriously crippled and injured, that it was with difficulty the boat could be taken to Mound City, the nearest point at which the repairs could be made. It would have been hazardous, if not impracticable, to have taken the boat to Cincinnati for that purpose. The interests of all parties required that the repairs should be made without delay. The owners resided in a distant city, and had neither means nor credit to make the repairs at Mound City. They were represented by the master, who made no objection to the repairs being made by the insurance company, but was present a portion of the time they were in progress, and gave directions as to the manner in which they should be made. Moreover, upon their completion, he took possession of the boat, for the owners, and gave the due-bill as their agent for the amount expended. This was clearly a legal assent by the owners to the making of the repairs. It is also worthy of remark, that the insurers of the boat had expressly reserved in the policy, in case of accident to the boat, and the neglect of the owners to have the necessary repairs promptly made, the right to make them "on account of the assured." That they were made judiciously, and with due regard to economy, clearly appears from the evidence. It is also distinctly proved, that after the repairs were made, the boat was delivered to the master with the express understanding that it was bound for the amount expended, and that

it would not have been put within the control of the master on any other condition. And it is also proved, that this was in strict accordance with the general usage on the western rivers.

I will now briefly notice the other objection to the claim of the insurance company, namely, that the advances for repairs were made for their benefit, and in discharge of their liability as insurers of the boat. This objection, if sustained by the evidence, must be fatal to this claim. But the facts, so far as they are developed in this case, negative the conclusion insisted on. The due-bill given by the master, on the settlement for the repairs, with the recitals which have been noticed, is a full answer to this objection. It is a distinct acknowledgment of the indebtedness of the owners to the insurance company, in the amount advanced for the repairs, without any reference to any liability of the company on their policy. The libel also, sworn to by the secretary of the company, and not contradicted by the evidence, distinctly alleges that the advances for repairs were justly due by the owners of the boat. As a further and conclusive answer to the objection urged to this claim, it should be stated that from the facts before the court it appears the insurance company had previously paid the wrecking company their full proportion of the claim for raising the boat, exclusive of the amount paid for repairs. It is possible that all the facts connected with these transactions are not before the court. I can only adjudicate on such facts as are in evidence in the case. From these it appears that the Eureka Insurance Company had a risk of $5,000 in the boat; and that the whole amount of insurance in that and other companies was $12,000; the assumed value of the boat being $18,000. By the terms of the policies the insurers reserved the right to repair the boat in case of accident or damage, and they were liable to the owners in the proportion that $12,000 bears to $18,000. The charge of the wrecking company, as already stated, was $4,500; and upon an adjustment made on that basis, the sum for which the insurers were liable was $3,000. The president of the wrecking company testifies that this amount was paid by the insurance companies, and was in full discharge of their liability for raising the boat. I can have no hesitation, therefore, in holding that the claim of the Eureka Insurance Company is established by the evidence, and is a lien on the boat, ranking in privilege next to the salvage claim of the Missouri Wrecking Company. This lien rests on the footing of money loaned or advanced for repairs to the boat, without which it would have been of little value, and could not possibly have prosecuted its business. The money so advanced and applied may be supposed, therefore, to have inured to the benefit of prior lien-holders. And according to the doctrine distinctly asserted by Dr. Lushington, in the case of The Aline, 1 W. Rob. Adm. 119, 120, the persons making such advances have a priority, to the extent of the repairs made, over all other lien-holders. But the case before me does not call for a more extended exposition of this principle.

The remaining questions arising in the case will now be disposed of. And here, I may remark, there is no controversy as to the claims for wages, and of material-men, accruing after the boat was raised and repaired. These claims are satisfactorily proved, and will have the same rank of privilege, in the distribution of the fund in the registry, as the claim of the Eureka Insurance Company. The claims thus having a priority of lien being satisfied, there will still be a remnant in the registry to be apportioned to other claimants. Of these, the claims for wages earned before the accident to the boat will stand next in the order of privilege, and will be paid in full, if the fund is sufficient for that purpose. If not, there will be a pro rata application of the balance of the fund. If, after satisfying the liens in the order stated, there should be a balance in the registry, it will be applied pro rata to the material-men, whose claims import a maritime lien. In this class are included the claims for stores, supplies, etc., furnished at St. Louis, Cairo, Louisville, and Pittsburg. The Fort Wayne being a foreign boat as to these places, the claimants have an undoubted maritime lien. But claims originating at Cincinnati, being the home port of the boat, do not imply a lien, and must be rejected. The proctor, representing these claims, strenuously insists that Cincinnati is not the home port of the boat, and that the claimants therefore have a lien. It is true a majority of the owners resided at Pittsburg, but the owners of six-sixteenths were residents of the state of Ohio, one of whom was the managing owner. The boat was enrolled at Cincinnati as of that place; and this affords, prima facie, the presumption that this was its home port. This presumption may be rebutted by evidence that all the owners notoriously resided elsewhere. But the evidence establishes the fact that a part of the owners, including the managing owner, resided in Ohio. The act of congress requires the enrollment to be made in the district "at or nearest" to which the owner or ship's husband usually resides. The managing owner, in the case of western steamboats, answers substantially to the ship's husband as used in the act of congress; and, as in this case, his residence was at Cincinnati, the enrollment of the Fort Wayne was properly made there, and that must be regarded as the home port. Newb. Adm. 176 [Dudley v. The Superior, Case No. 4,115]; 1 Pars. Mar. Law, 32 et seq.

The only remaining claim is that of Fulton & Son, being an original bill for building the Fort Wayne, at Pittsburg. As it is very clear that the fund in the registry will be exhausted in payment of the claims which

have priority over this, it can be of no importance to these claimants, whether theirs is allowed or rejected. It may be proper to state, however, that it is now the established law in this country that building debts do not constitute a maritime lien. In the case of the People's Ferry Co. v. Beers, 20 How. [61 U. S.] 393, the supreme court of the United States decide, that "the admiralty jurisdiction of the courts of the United States does not extend to cases where a lien is claimed by the builders of a vessel for work done and materials found in its construction." The ruling of that court is decisive of the claim in question. It proceeds on the theory that building debts are contracted on the personal credit of the owner, and do not, therefore, create a maritime lien. This result is not affected by the fact that these debts are declared to be liens by a statute of the state of Pennsylvania, within which state the Fort Wayne was built. Conceding it to be within the jurisdiction of the admiralty courts of the Union to enforce local liens under state laws, it is clear that state legislation cannot supersede or displace liens existing under the general maritime law. A decree may be drawn providing for the application of the fund in the registry in the order of priority, and on the principles indicated by the court.