## PIEDMONT & GEORGES CREEK COAL COMPANY *v.* SEABOARD FISHERIES COMPANY, CLAIMANT, &c.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIRST CIRCUIT.

No. 58. Argued March 16, 17, 1920.—Decided October 11, 1920.

An oil company, owner of a fleet of fishing steamers and also of oil factories where the catch was delivered and the vessels coaled, having mortgaged this property and being without money or credit, made an agreement with a coal dealer to furnish the coal necessary for the season's operations, both parties understanding that the coal would be used by the factories as well as by the vessels, that the greater part would be used by the vessels, that the law would afford a lien on the vessels for the purchase price and that the coal dealer would thus have security. The coal was billed and delivered directly to the oil company, title passing with delivery; it was then stored by that company in its factories, and afterwards appropriated by it mainly to the vessels but partly to the factories, as occasion arose; and there was no understanding when the contract was made or at times of delivery that any part of it was for any particular vessel or for the vessels then composing the fleet. In libels of some of the vessels involving the coal dealer's rights as against a purchaser under the prior mortgage, *held:* (1) That the coal dealer had no maritime

(1)

lien for furnishing supplies "to a vessel . . . upon the order of the owner," under the Act of June 23, 1910, c. 373, § 1, 36 Stat. 604, because the coal furnished the vessels was furnished by their owner and not by the coal dealer, p. 6, *et seq.;* (2) That the fact that such maritime use had been contemplated did not render the subsequent appropriation by the owner a furnishing by the coal dealer to the several vessels, p. 8; nor (3) was the understanding of the owner and the dealer that the law would afford a lien of any legal significance as against the purchaser under the mortgage. P. 10.

To hold that a maritime lien for the unpaid purchase price of supplies arises in favor of the seller merely because the purchaser, who is the owner of a vessel, subsequently appropriates the supplies to her use, would involve abandonment of the principle upon which maritime liens rest and the substitution therefor of the very different principle which underlies mechanics' and materialmen's liens on houses and other structures. P. 8.

253 Fed. Rep. 20, affirmed.

THE case is stated in the opinion.

*Mr. John M. Woolsey,* with whom *Mr. Frank Healy, Mr. F. C. Nicodemus, Jr.,* and *Mr. H. Brua Campbell* were on the brief, for petitioner:

Is the petitioner to be deprived of its lien and its decrees undermined for the benefit of the purchaser of the vessels at foreclosure sale, who acquired the vessels with full knowledge of the facts, merely for the reason that the petitioner did not do the impossible and indicate in advance of the delivery of the coal at the oil corporation's bins the name of each vessel to be supplied with coal and the amount to be appropriated to her?

It is urged that such a construction is out of line with previous well-considered judicial decisions and so limits the act of Congress that it is wholly unavailable as a source of credit to ship owners operating fleets of vessels.

The Act of June 23, 1910, affords a maritime lien for supplies furnished to a vessel, and where coal is delivered to the owner of a fleet of vessels for distribution among them, upon an express stipulation that the delivery is

made upon the credit of the vessels and not upon the credit of the owner, a lien attaches to each vessel for the coal actually distributed to and used by it.

The case of the petitioner is one of unusual hardship.

It parted with its coal solely upon the security of the lien given by the act of Congress. The coal was actually delivered to and used by the libeled vessels to the amount for which the lien was allowed against each of them. By the use of the petitioner's coal the vessels were kept in operation, contributing earnings to the oil corporation and its creditors, including the claimant herein, which under foreclosure proceedings, purchased the libeled vessels with knowledge that the petitioner asserted a maritime lien against them for coal unpaid for although actually delivered to, and used by, the vessels.

A maritime lien under such conditions is sustained by the weight of authority both prior to and subsequent to the passage of the Act of June 23, 1910. *The Yankee,* 233 Fed. Rep. 919; *Berwind-White Coal Co.* v. *Metropolitan S. S. Co.,* 166 Fed. Rep. 782; 173 Fed. Rep. 471 (materialman's lien); *The Kiersage,* 2 Curtis, 421 (materialman's lien); *The Cora P. White,* 243 Fed. Rep. 246 (where the claim of maritime lien was denied only because the coal was furnished the owner without mentioning that it was intended for use on a vessel); *The Murphy Tugs,* 28 Fed. Rep. 429 (maritime lien); *McRae* v. *Bowers Dredging Co.,* 86 Fed. Rep. 344 (maritime lien); *The Grapeshot,* 9 Wall. 129, 145; *The Lulu,* 10 Wall. 192, 204.

While it is true that certain of the above decisions were rendered under state statutes, we fail to perceive, in view of the wording of the lien act, any substantial basis for distinguishing them or questioning their authority.

Especial reliance is placed upon the decision in *The Kiersage,* 2 Curtis, 421. The Maine statute involved in that case allowed a lien for supplies "furnished to or for account of a vessel."

The lien act was intended to increase the security of persons furnishing supplies to vessels, not to narrow or circumscribe it, and hence should have an enlightened construction to meet modern needs.

It is not necessary in order to impress a maritime lien on a vessel that the supplies be actually delivered on board the vessel by the person who supplies them. *Ammon v. The Vigilancia*, 58 Fed. Rep. 698; *Delaware & Hudson Canal Co. v. The Alida*, 7 Fed. Cas. 399; *The James H. Prentice*, 36 Fed. Rep. 777.

It is settled that an owner may by agreement, express or implied, create a maritime lien on his vessel for supplies furnished. *The Kalorama*, 10 Wall. 208; *The Cimbria*, 214 Fed. Rep. 128; *The Alaskan*, 227 Fed. Rep. 594; *The George Dumois*, 68 Fed. Rep. 926; *The Fortuna*, 213 Fed. Rep. 284; *The South Coast,* 247 Fed. Rep. 84.

Agreements for a general lien such as was here shown have frequently had judicial approval, and the fact that the supplies have been first charged to the owner on the supplier's books has been held immaterial. *The Patapsco*, 1871, 13 Wall. 329; *Lower Coast Transportation Co. v. Gulf Refining Co.*, 211 Fed. Rep. 336; *Freights of The Kate*, 63 Fed. Rep. 707; *The Advance*, 72 Fed. Rep. 793; *Astor Trust Co. v. White & Co.*, 241 Fed. Rep. 57.

As between the owner of a vessel, who agrees to give a maritime lien for money or supplies, and the person furnishing the money or supplies on the credit of the vessel, the owner is estopped to deny that the money or supplies were actually used for the vessel. *The Worthington*, 133 Fed. Rep. 725; *The Schooner Mary Chilton*, 4 Fed. Rep. 847; *The Robert Dollar*, 115 Fed. Rep. 218; *United Hydraulic Cotton Press v. Alexander McNeil*, Fed. Cas. 14,404; *The Mary*, 1 Paine, 671.

Mr. *Philip L. Miller*, with whom Mr. *Royall Victor* was on the brief, for respondent.

MR. JUSTICE BRANDEIS delivered the opinion of the court.

The Atlantic Phosphate and Oil Corporation owned a fleet of nineteen fishing steamers. It owned also factories at Promised Land, Long Island, and Tiverton, Rhode Island, to which the fish caught were delivered and at which its vessels coaled. When the fishing season of 1914 opened the company was financially embarrassed. Its steamers and factories had been mortgaged to secure an issue of bonds. Bills for supplies theretofore furnished remained unpaid. The company had neither money nor credit. It could not enter upon the season's operations unless some arrangement should be made to supply its vessels and factories with coal. After some negotiations, the Piedmont and Georges Creek Coal Company, then a creditor for coal delivered during the year 1913, agreed to furnish the Oil Corporation such coal as it would require during the season of 1914—the understanding of the parties being that the coal to be delivered would be used by the factories as well as by the vessels, that the greater part would be used by the vessels, that the law would afford a lien on the vessels for the purchase price of the coal and that the Coal Company would thus have security. Shipments of coal were made under this agreement from time to time during the spring and summer as ordered by the Oil Corporation. In the autumn receivers for the corporation were appointed by the District Court of the United States for the District of Rhode Island, and later a suit was brought to foreclose the mortgage upon the vessels and factories. At the time the receivers were appointed five cargoes of coal shipped under the above agreement had not been paid for. The Coal Company libeled twelve of the steamers asserting maritime liens for the price and value of either all the coal or of such parts as had been used by the libeled vessels respectively.

Meanwhile, the vessels were sold under the decree of fore-
closure. The Seaboard Fisheries Company became the
purchaser and, intervening as claimant in the lien pro-
ceedings, denied liability. The District Court held that
the Coal Company had a maritime lien on each vessel
for the coal received by it. *The William B. Murray,* 240
Fed. Rep. 147. The Circuit Court of Appeals reversed
these decrees with costs and directed that the libels be
dismissed. *The Walter Adams,* 253 Fed. Rep. 20. Then
this court granted the Coal Company's petition for a
writ of certiorari. 248 U. S. 556.

As to the facts proved there is no disagreement between
the two lower courts. The substantial question pre-
sented is whether these facts constitute a furnishing of
supplies by the Coal Company to the vessels upon order
of the owner within the provisions of the Act of June 23,
1910, c. 373, § 1, 36 Stat. 604.[1] That coal was furnished
to the vessels to the extent to which they severally re-
ceived it on board, is clear. The precise question, there-
fore, is: Was the coal furnished by the libelant, the Coal
Company, or was it furnished by the Oil Corporation, the
owner of the fleet? In determining this question additional
facts must be considered:

No coal was delivered by the Coal Company directly
to any vessel; and it had no dealings of any kind concern-
ing the coal directly with the officers of any vessel. All
the coal was billed by the Coal Company to the Oil Cor-
poration and there was no reference on any invoice, or
on its books, either to the fleet or to any vessel. There

---

[1] Act of June 23, 1910, c. 373, § 1: Any person furnishing repairs,
supplies, or other necessaries, including the use of dry dock or marine
railway, to a vessel, whether foreign or domestic, upon the order of the
owner or owners of such vessel, or of a person by him or them author-
ized, shall have a maritime lien on the vessel which may be enforced
by a proceeding in rem, and it shall not be necessary to allege or prove
that credit was given to the vessel.

was no understanding between the companies when the agreement to supply the coal was made or when the coal was delivered that any part of it was specifically for any one of the several vessels libeled, or that it was for any particular vessel of the fleet, or even for the vessels then composing the fleet. Indeed, the first shipment was stated on the invoice to be "coal for factory." The negotiations of the Oil Corporation with the Coal Company did not relate to coal required at that time by the particular vessels subsequently libeled as distinguished from other vessels of the fleet.

The coal was sold f. o. b. at the Coal Company's piers which were at St. George, Staten Island, and Port Reading, New Jersey. At these piers it was loaded on barges which were towed either to the Oil Corporation's plant at Promised Land or to that at Tiverton. Some of these barges were supplied by the Oil Corporation, some by the Coal Company. If supplied by the latter, trimming and towing charges were added to the agreed price of the coal. Upon arrival of the coal at the factories it was placed in the Oil Corporation's bins. At Promised Land— which received four of the five shipments—the bins already contained other coal (1068 tons) which had been theretofore purchased by the Oil Corporation and had been paid for. With this coal on hand that delivered by libelant was commingled. At each plant both the vessels and the factory were from time to time supplied with coal from the same bins; but the greater part of the coal supplied from each plant was used by the vessels. Weeks, and in some instances months, elapsed between placing the coal in the bins and the delivery of it by the Corporation to the several vessels. When it made such deliveries it furnished coal to the vessels, as it did to the factories, not under direction of the Coal Company but in its discretion as owner of the coal and of the business.

The quantity of coal delivered to each vessel was

proved; but to what extent the coal supplied to the several vessels which bunkered at Promised Land came from the 1068 tons previously purchased, and to what extent it came from the lots purchased from the Coal Company, it was impossible to determine. In making the computations which formed the basis of the decrees in the District Court, it was assumed that, of the coal supplied to the several vessels which bunkered at Promised Land, a proportionate part of that received by each had come from the coal purchased from libelant.

The Coal Company contends on these facts that it furnished necessary supplies to the several vessels within the meaning of § 1 of the Act of June 23, 1910. But the facts show that no coal was furnished by that company to any vessel "upon the order of the owner." The title to the coal had passed to the Oil Corporation when it was loaded on board the barges at the Coal Company's piers. It was delivered to Promised Land and Tiverton as the Oil Corporation's coal and placed in its bins. As its coal the later distribution was made in its discretion to vessels and factories. A large part of the coal so acquired by the Oil Corporation for use in its business was subsequently appropriated by it specifically to the use of the several vessels of the fleet and this use of the coal by vessels of the fleet was a use which had been contemplated by the parties when it was purchased. But the fact that such a use had been contemplated does not render the subsequent appropriation by the owner a furnishing by the coal dealer to the several vessels.

To hold that a lien for the unpaid purchase price of supplies arises in favor of the seller merely because the purchaser, who is the owner of a vessel, subsequently appropriates the supplies to her use would involve abandonment of the principle upon which maritime liens rest and the substitution therefor of the very different prin-

ciple which underlies mechanics' and materialmen's liens on houses and other structures. The former had its origin in desire to protect the ship; the latter mainly in desire to protect those who furnish work and materials. The maritime lien developed as a necessary incident of the operation of vessels. The ship's function is to move from place to place. She is peculiarly subject to vicissitudes which would compel abandonment of vessel or voyage, unless repairs and supplies were promptly furnished. Since she is usually absent from the home port, remote from the residence of her owners and without any large amount of money, it is essential that she should be self-reliant—that she should be able to obtain upon her own account needed repairs and supplies. The recognition by the law of such inherent power did not involve any new legal conception, since the ship had been treated in other connections as an entity capable of entering into relations with others, of acting independently and of becoming responsible for her acts. Because the ship's need was the source of the maritime lien it could arise only if the repairs or supplies were necessary; if the pledge of her credit was necessary to the obtaining of them; if they were actually obtained; and if they were furnished upon her credit. The mechanic's and materialman's lien, on the other hand, attaches ordinarily although the labor and material cannot be said to have been necessary; although at the time they were furnished there was no thought of obtaining security upon the building; and although the credit of the owner or of others had in fact been relied upon. The principle upon which the mechanic's lien rests is, in a sense, that of unjust enrichment. Ordinarily, it is the equity arising from assumed enhancement in value resulting from work or materials expended upon the property without payment therefor which is laid hold of to protect workmen and others who, it is assumed, are especially deserving, would ordinarily fail

to provide by agreement for their own protection and would often be unable to do so.[1]

The fact found by the lower courts that the parties understood the law would afford a lien on the vessels for the coal is, in this controversy, without legal significance. If the coal had been furnished to the several vessels by the libelant, maritime liens would have arisen and could have been established under the statute without proof that credit was given to the vessels. Since the libelant did *not* furnish any coal to the vessels, the erroneous belief of the parties that the law would afford a lien either for all the coal furnished to the Oil Corporation or for that delivered by it to the several vessels could not create a lien under the statute. Clearly no maritime lien could arise therefrom valid as against the claimant which had acquired title to the vessels under a mortgage antedating the purchase. *Astor Trust Co.* v. *E. V. White & Co.*, 241 Fed. Rep. 57.

The difficulty which confronts the Coal Company does not lie in the fact that the contract for the coal was made with the Oil Corporation. A vessel may be made liable *in rem* for supplies, although the owner can be made liable therefor *in personam;* since the dealer may rely upon the credit of both. *The Bronx*, 246 Fed. Rep. 809. Likewise, the fact that the coal which was supplied to the several vessels had been purchased under a single contract presents no difficulty. For while one vessel of a fleet cannot be made liable under the statute for supplies furnished to the others, even if the supplies are furnished to all upon orders of the owner under a single contract, *The Columbus*, 65 Fed. Rep. 430; 67 Fed. Rep. 553; *The*

---

[1] Compare *Van Stone* v. *Stillwell & Bierce Mfg. Co.*, 142 U. S. 128, 136. See *O'Conner* v. *Warner*, 4 Watts & S. 223, 226; *Bolton* v. *Johns*, 5 Pa. St. 145, 150; *Taggard* v. *Buckmore*, 42 Maine, 77, 81; *Buck* v. *Brian*, 2 How. (Miss.) 874, 881; *Montandon & Co.* v. *Deas*, 14 Alabama, 33, 44; *Mochon* v. *Sullivan*, 1 Mont. 470, 473.

*Newport*, 114 Fed. Rep. 713; *The Alligator*, 161 Fed. Rep. 37; *Astor Trust Co.* v. *E. V. White & Co.*, 241 Fed. Rep. 57, 61; each vessel so receiving supplies may be made liable for the supplies furnished to it. *The Murphy Tugs*, 28 Fed. Rep. 429. The difficulty which, under the general maritime law, would have blocked recovery by the Coal Company is solely that it did not furnish coal to the vessels upon which it asserts a maritime lien; and there is nothing in the Act of June 23, 1910, which removes that obstacle.

It is urged by the Coal Company that it was the intention of Congress in passing the act to broaden the scope of the maritime lien and that the construction of the act adopted by the Circuit Court of Appeals renders the statute inoperative in an important class of cases which it was intended to reach. The language of the statute affords no basis for the latter assertion, and the Reports of the Committees of Congress (Senate Report, No. 831, 61st Cong., 2d sess.) show that it is unfounded. Those reports state that the purpose of the act was this: *First,* to do away with the artificial distinction by which a maritime lien was given for supplies furnished to a vessel in a port of a foreign country or state, but denied where the supplies were furnished in the home port or state. *The General Smith,* 4 Wheat. 438. *Second,* to do away with the doctrine that, when the owner of a vessel contracts in person for necessaries or is present in the port when they are ordered, it is presumed that the materialman did not intend to rely upon the credit of the vessel, and that hence, no lien arises. *The St. Jago de Cuba,* 9 Wheat. 409. *Third,* to substitute a single federal statute for the state statutes in so far as they confer liens for repairs, supplies and other necessaries. *Peyroux* v. *Howard,* 7 Pet. 324. The reports expressly declare that the bill makes "no change in the general principles of the present law of maritime liens, but merely substitutes a single

statute for the conflicting state statutes." The act relieves the libelant of the burden of proving that credit was given to the ship when necessaries are furnished to her upon order of the owner, but it in no way lessens the materialman's burden of proving that the supplies in question were furnished to her by him upon order of the owner or of some one acting by his authority. The maritime lien is a secret one. It may operate to the prejudice of prior mortgagees or of purchasers without notice. It is therefore *stricti juris* and will not be extended by construction, analogy or inference. *The Yankee Blade*, 19 How. 82, 89; *The Cora P. White*, 243 Fed. Rep. 246, 248.

The Coal Company relies strongly upon *The Kiersage*, 2 Curtis, 421, and *Berwind-White Coal Mining Co.* v. *Metropolitan Steamship Co.*, 166 Fed. Rep. 782; 173 Fed. Rep. 471. The language of the state statutes there under consideration differs from that of the federal act. Furthermore, the state legislation creating liens for work and materials furnished in the repair and supply, as well as in the construction of vessels, are largely extensions of the local mechanic's lien laws applicable to buildings.[1]

The Coal Company also urges upon our attention *The Yankee*, 233 Fed. Rep. 919, 925, 927. There the court in sustaining a maritime lien declared that the supplies were delivered not to the charterer but to the vessel, holding that "a materialman may make actual delivery of supplies to a vessel in the maritime sense, by causing them to be transported by rail and water carriers by interrupted stages from point of origin to the vessel side, when the transaction is begun by a valid order indicating that the supplies are for the vessel and are to be delivered to her, and is completed by an actual delivery to the vessel

[1] See "Confusion in the Law Relating to Materialmen's Liens on Vessels," 21 Harvard Law Review, 332, and "The New Federal Statute Relating to Liens on Vessels," 24 Harvard Law Review, 182, both by Fitz-Henry Smith, Jr.

consistent with the instructions of the order and the intentions of the parties giving and accepting it." And in respect to the coal supplied the court there found specifically that "the quantity to be supplied to and daily consumed by the Yankee, was mentioned and considered by the parties." In the case at bar there was no understanding when the contract was made, or when the coal was delivered by the libelant, that any part of it was for any particular vessel or even for the vessels then composing the fleet. And it was clearly understood that the purchasing corporation would apply part of the coal to a non-maritime use. The difficulty here (unlike that presented in *The Vigilancia*, 58 Fed. Rep. 698; *The Cimbria*, 156 Fed. Rep. 378, 382; and *The Curtin*, 165 Fed. Rep. 271) is not in failure to show that the coal was furnished *to* the vessels but in failure to prove that it was furnished *by* the libelant.

It was also argued that the parties made an express agreement that the Coal Company should have a lien; that is, that they created by agreement a non-statutory lien. The concurrent findings of fact by the lower courts, which we accept (*Baker* v. *Schofield*, 243 U. S. 114, 118; *La Bourgogne*, 210 U. S. 95, 114; *The Germanic*, 196 U. S. 589, 595;) are to the contrary.

*Affirmed.*