

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-25-2004

# PNC Bank DE v. F/V Miss Laura

Precedential or Non-Precedential: Precedential

Docket No. 03-1695

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"PNC Bank DE v. F/V Miss Laura" (2004). *2004 Decisions.* Paper 353.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/353

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT
_____

No. 03-1695
_____


PNC BANK DELAWARE, a banking
institution organized under the laws of
the State of Delaware with a place of
business in Wilmington, County of New
Castle, State of New Jersey

v.

F/V MISS LAURA, (O.N. 542762), her
engines, machinery, equipment, masts,
fishing permits, etc., in rem

R.D. GRIER & SONS, INC.; MAINE
SHIPYARD & MARINE RAILWAY,
INC.; SMITHWICK & MARINERS
INSURANCE COMPANY;
DON'S HYDRAULICS, INC.,

Intervenor-Plaintiffs in District Court

Maine Shipyard & Marine Railway, Inc.,
Appellant

_____

On Appeal from the United States
District Court
for the District of New Jersey
No. 01-cv-04427

District Judge: Honorable Joseph E.
Irenas
_____

Argued: March 22, 2004

Before: FUENTES, SMITH and
GIBSON,[*] Circuit Judges.


(Filed: August 25, 2004)

For Appellant:
Cianciulli & Ouellette
Stephen M. Ouellette    (ARGUED)
163 Cabot Street
Beverly, MA  01915

For Appellee:
Archer & Greiner
Arthur H. Jones, Jr.
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033

Tompkins, Clough, Hirshon & Langer
Leonard W. Langer      (ARGUED)
3 Canal Plaza
P.O. Box 15060
Portland, ME  04112-5060

_____

OPINION OF THE COURT
_____


_____

*The Honorable John R. Gibson,
United States Court of Appeals for the
Eighth Circuit, sitting by designation.

JOHN R. GIBSON, Circuit Judge:

This case presents the novel question of whether, assuming a vessel's fishing history may be the subject of a maritime lien, the lien follows the transfer of the fishing history to a replacement vessel after the original vessel sinks. The district court held that fishing history could not be "salvaged" from a sunken vessel and therefore any maritime lien that may have existed was extinguished at the time of the sinking. We affirm, but on different grounds.

I.

Maine Shipyard & Marine Railway, Inc., provided repair services in 1997 to the vessel *F/V Miss Penelope*, which was owned by David Greenly. This provision of services entitled Maine Shipyard under federal law to a maritime lien against the vessel and its appurtenances. See 46 U.S.C. § 31342 (2000); Gowen, Inc. v. F/V Quality One, 244 F.3d 64, 67 (1st Cir. 2001). The *Miss Penelope* sank on January 28, 1998.

As a result of a complex scheme of federal rules and regulations designed to protect declining fishing stocks and otherwise conserve fishery resources, the fishing history and fishing permits of a vessel like the *Miss Penelope* are integral to the value of the vessel itself. See generally 16 U.S.C. § 1801 (2000); Gowen, 244 F.3d at 68 (some fishing vessels "are valuable significantly, and sometimes almost entirely, because of their

permits"). The amount and species of fish that a particular vessel is licensed to catch often depends on that vessel's fishing history, and certain species cannot be fished at all except by or in place of vessels that have previously held permits to do so. See, e.g., 50 C.F.R. § 648.4(a)(1)(i). However, when a vessel sinks, its fishing history does not go down with the ship; instead, the history and permits may be applied to a replacement vessel. See id. Thus, when the *Miss Penelope* sank, Greenly applied her fishing history and permits to the vessel he bought to replace her, the *F/V Miss Laura*.

Greenly's purchase of the *Miss Laura* was financed by the appellee, PNC Bank Delaware, Inc., which made an initial loan of $475,000 and later increased the amount of the loan to $570,000. In exchange, Greenly executed and delivered a Promissory Note to PNC, which was secured by a Preferred Ship Mortgage on the *Miss Laura*. Greenly later defaulted on the note.

PNC commenced the present action seeking the judicial sale of the *Miss Laura*. Maine Shipyard intervened, claiming that it held a maritime lien on the *Miss Laura* to the extent of her fishing permits and history because the permits and history had been transferred from the *Miss Penelope*. Maine Shipyard further contends that its lien has priority over any security interest held by PNC.

II.

Maine Shipyard rests its argument primarily on Gowen, Inc. v. F/V Quality

2

One, 244 F.3d 64, 67-70 (1st Cir. 2001), in which the First Circuit held that a vessel's fishing permits were appurtenances to the vessel and therefore subject to a lien on the vessel. The court reasoned that the market value and creditworthiness of the vessel depended as much on the fishing permits as on tangible items like the engine or navigation equipment; thus, a creditor's lien should be understood to extend over the permits. Id. at 68-69.

PNC persuasively responds that Gowen does not govern the instant situation because the fishing permits in that case were still attached to the *original* vessel, whereas the present situation involves the transfer of the fishing permits to a *replacement* vessel. Thus, even if we were to follow Gowen and hold that a vessel's fishing permits may be the subject of a maritime lien, we would still need some legal basis for concluding that the lien extends to a replacement vessel once the permits are transferred.

Maine Shipyard simply ignores this problem, perhaps because neither Gowen nor other statutory or case law provides such a legal basis. Instead, the law of maritime liens has consistently recognized that a maritime lien attaches only to the specific vessel to which services are provided. See, e.g., 46 U.S.C. § 31342 (2004) ("[A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner– (1) has a maritime lien on *the* vessel. . . .") (emphasis added); Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 4 (1920) ("[O]ne vessel of a fleet cannot be made liable under the [Federal Maritime Lien Act] for supplies furnished to the others, even if the supplies are furnished to all upon orders of the owner under a single contract."); In re Container Applications Int'l, Inc., 233 F.3d 1361, 1365-66 (11th Cir. 2000) (following Piedmont and denying maritime lien because the purported lienholder did not provide necessaries to any particular vessel). The vessel-specific character of maritime liens results from the legal fiction that a vessel receiving services "is considered to be a distinct entity responsible only for its own debts." Foss Launch & Tug Co. v. Char Ching Shipping U.S.A., Ltd., 808 F.2d 697, 701 (9th Cir. 1987). Because Maine Shipyard provided no services to the *Miss Laura*, its attempt to enforce a lien over that vessel violates this principle of maritime liens. The *Miss Laura* cannot be held responsible for the debts of the *Miss Penelope*.

In resolving this case, we need not endorse the district court's position that fishing history cannot be salvaged from a sunken vessel. The court believed that Maine Shipyard's lien over the fishing permits could survive the sinking of the *Miss Penelope*, if at all, only through principles of salvage law. However, the court concluded that salvage law was inapplicable because it understood salvage to involve some sort of physical rescuing or saving of a tangible piece of property, which did not occur here. Thus, it held that Maine Shipyard's lien extinguished at the time of the sinking.

We believe this rationale comes

needlessly close to conflicting with the theory of Gowen, and are mindful of our obligation to avoid circuit conflict. Under the district court's reasoning, any lien held by Maine Shipyard over the *Miss Penelope*'s fishing permits ceased to exist once the vessel sank. It is possible that a court following Gowen would not agree; after all, the fishing permits continued to exist in at least some form, retained significant value, and contributed to the creditworthiness of the vessel in the first place. See Gowen, 244 F.3d at 68 ("Thus, not only the market value but the creditworthiness of the fishing vessel may well depend on its permits quite as much as on its engine, physical dimensions, and navigation equipment."); see also United States v. Freights, Etc. of the Mount Shasta, 274 U.S. 466, 470 (1927) (intangibles may be subject to maritime liens against the vessel); The Fort Wayne, 6 F. Cas. 119, 122 (S.D. Ohio 1861) ("[I]f any part of the vessel is saved, this lien adheres to it, even to the last plank."). Should a creditor attempt to foreclose on a sunken vessel's fishing permits *before* the permits become incorporated into a second vessel, a court following Gowen might enforce the lien, whereas the district court's rationale clearly would deny it.

Rather than invite this possible conflict, we base our holding on the undisputed fact that Maine Shipyard did not provide services to the vessel over which it now claims a lien. Even if, as Maine Shipyard metaphorically suggests, the "valuable and transferable fishing permits and history remain very much afloat," Maine Shipyard has not cited, nor have we found, any cases where a lien over salvaged or never-sunken parts of a vessel was extended to a subsequent vessel to which those parts became attached. Instead, maritime liens have consistently been limited to the specific vessel to which services were provided. See Piedmont, 254 U.S. at 4 ("The difficulty which under the general maritime law would have blocked recovery by the [purported lienholder] is solely that it did not furnish coal to the vessels upon which it asserts a maritime lien; and there is nothing in the [Federal Maritime Lien Act] which removes that obstacle."); see also 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law*, § 9-1 (4th ed. 2004) ("A maritime lien is a privileged claim upon maritime property, such as a vessel, arising out of services rendered to or injuries caused by that property."). We are bound to follow this long-standing principle here and therefore conclude that any lien held by Maine Shipyard on the *Miss Penelope*'s fishing permits and history ceased to exist once the *Miss Penelope* sank and the fishing history was incorporated into the *Miss Laura*.

Because we hold that Maine Shipyard has no cognizable property interest in the *Miss Laura*, we need not consider its assertion that PNC is ineligible to assert a lien in an *in rem* action against the *Miss Laura*. Maine Shipyard has no standing to make such a challenge. See, e.g., Citicorp Sav. of Illinois v. First Chicago Trust Co. of Illinois, 645 N.E.2d 1038, 1045 (Ill. App. Ct. 1995) ("Standing

4

requires injury in fact to a legally cognizable interest."); <u>Southern Maryland Oil, Inc. v. Kaminetz</u>, 272 A.2d 641, 644-45 (Md. 1971) (party lacks standing to challenge a mortgage foreclosure sale unless that party has an interest in the proceeds of the sale or has an interest in the property which may be adversely affected as a result of the sale).

We will affirm the district court's judgment.