ITEL CONTAINERS INTERNATIONAL CORPORATION, Flexi–Van Leasing Inc., Cross–County Leasing Ltd., now named Textainer, Inc. and Textainer Special Equipment Ltd., Plaintiffs–Appellees,

v.

ATLANTTRAFIK EXPRESS SERVICE LTD., Sea Containers Ltd., Seaco Services Ltd., Sea Containers Australia Ltd., Seaco Inc., Sea Containers America Inc., Defendants,

M/V TAVARA, AES Express, AES Challenge, Nagara and Cavara, their engines, boilers, tackle, freights, etc., in rem, and Nagara Ltd., Nagara Tam Ltd., Contender I Ltd., Strider I Ltd., and Strider IV Ltd., Defendants–Appellants.

No. 247, Docket 92–7464.

United States Court of Appeals,
Second Circuit.

Argued Sept. 23, 1992.
Decided Dec. 14, 1992.

Beth Jacob, New York City (Jonathan F. Mack, Carter, Ledyard & Milburn, New

York City, of counsel), for defendants-appellants.

Alfred E. Yudes, Jr., New York City (Cristina Perez, Watson, Farley & Williams, New York City, of counsel), for plaintiff-appellee Itel Containers Intern. Corp.

Michael D. Wilson, New York City (Victor P. Corso, Kirlin, Campbell & Keating, New York City, of counsel), for plaintiffs-appellees Textainer Inc. and Textainer Special Equipment Ltd.

Institute of Intern. Container Lessors, Ltd., Bedford, NY (Edward A. Wooley, Bedford, NY, Kieron F. Quinn, F. Paul Bland, Jr., Quinn, Ward and Kershaw, Baltimore, MD, of counsel) submitted a brief as amicus curiae.

Before: VAN GRAAFEILAND, WINTER and MAHONEY, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Defendants *in rem*, M/V Tavara, M/V AES Challenge, M/V Nagara and M/V Cavara, and intervening owners, Nagara Tam Ltd., Strider IV Ltd., Nagara Ltd. and Contender I Ltd., appeal from that part of a judgment of the United States District Court for the Southern District of New York (Carter, J.) which sustains maritime lien claims of plaintiffs, Itel Containers International Corporation, Textainer, Inc. and Textainer Special Equipment Ltd. For the reasons that follow, we reverse.

Because the pertinent facts have been discussed in detail in our opinion on a prior appeal, 909 F.2d 698 (2d Cir.1990), and lower court opinions cited therein, a brief factual summary will suffice for present purposes. In 1984, Atlanttrafik Express Service Ltd. ("AES") was formed to operate a container shipping line. The vessels it used, the defendants *in rem* in this case, were owned by the intervenors-defendants and were chartered to AES. To conduct its operations, AES leased shipping containers from several commercial container lessors, including plaintiffs. Consistent with industry practice, the containers were delivered in bulk and were not designated for use on any particular ship. Also, consistent with industry practice, AES leased up to three times as many containers as it could carry on its ships at any given time. The decisions as to which ships would receive particular containers for transport were made solely by AES.

AES was not a successful venture and ceased operations in early 1986. Thereafter, plaintiffs gave AES notice of default under the container leases, demanded return of their equipment, commenced an action against AES for breach of their leases, and asserted *in rem* claims against the ships. Plaintiffs later added *in personam* claims against Sea Containers Ltd. and certain of its affiliates, alleging a joint venture or principal-agent relationship between Sea Containers Ltd. and AES.

After a bench trial, the district court found in defendants' favor and dismissed plaintiffs' complaints. 725 F.Supp. 1303. On appeal, this court affirmed dismissal of the *in personam* claims but remanded the case for findings of fact and conclusions of law as to the maritime lien claims, as required by Fed.R.Civ.P. 52(a). 909 F.2d at 704.

On remand, the trial court sustained the maritime lien claims of Itel, Textainer and Textainer Special Equipment. 781 F.Supp. 975. Because it was impossible to ascertain which containers were used on board which ships, the court determined the amount of the lien on each ship by apportioning total damages among the ships based on their respective cargo capacities. *Id.* at 986. This appeal is from the judgment that followed.

## DISCUSSION

A maritime lien is:

a special property right in the vessel, arising in favor of the creditor by operation of law as security for a debt or claim. The lien arises when the debt arises, and grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds.

*Equilease Corp. v. M/V Sampson,* 793 F.2d 598, 602 (5th Cir.) (en banc), *cert. denied,* 479 U.S. 984, 107 S.Ct. 570, 93 L.Ed.2d 575 (1986). Under United States law as it existed at all relevant times in this

case, a maritime lien exists in favor of "[a]ny person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel." 46 U.S.C. § 971 (1982).[1]

Defendants contend that under this statute maritime liens cannot be claimed for supplies furnished simply to fleet owners and that supplies are furnished to vessels within the meaning of section 971 only when they are either provided directly to or are earmarked for specific vessels. Defendants argue that plaintiffs furnished containers to AES, not to the ships, and that it was AES who furnished the containers to the individual ships. We agree.

The seminal Supreme Court case on this issue is *Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920), in which the Court held that a supplier of coal to both a fish oil factory and a fleet of ships had no maritime lien against the ships. Justice Brandeis, writing for the Court, held that there was no lien because there was:

no understanding when the contract was made, or when the coal was delivered by the libelant, that any part of it was for any particular vessel or even for the vessels then composing the fleet. And it was clearly understood that the purchasing corporation would apply part of the coal to a non-maritime use.

*Id.* at 13, 41 S.Ct. at 4.

■ In Gilmore & Black's authoritative work *The Law of Admiralty* (2d ed. 1975), the authors suggest that Justice Brandeis' overkill recitation of facts negativing the existence of a lien makes *Piedmont* a "slippery precedent" for those shipowners arguing for a similar result in cases where less than all of the facts are present. *Id.* § 9–36, at 661. However, as *Piedmont* has been interpreted in this circuit, it does not support a claim of maritime lien by a supplier who furnishes goods in bulk to a fleet owner or charterer, with apportionment among the ships being made at the discretion of the recipient. In *Bankers Trust Co. v. Hudson River Day Line*, 93 F.2d

457, 459 (2d Cir.1937), we held that there can be no lien in favor of a materialman:

when he authorizes the owner to distribute the supplies among such of his fleet as he sees fit. In such a case, even though the owner must under the contract deliver the supplies to some ship, it is his decision that controls which ship it shall be. "Furnishing ... supplies ... to any vessel" must, we think, include that factor of choice; otherwise they are furnished to the owner.

We said, quoting *The American Eagle*, 30 F.2d 293, 295 (D.Del.1929), that supplies must be " 'for the use of *named vessels in specified portions.*' " *Id.* at 458 (emphasis in original).

We were not unique in interpreting *Piedmont* in this fashion. *See, e.g., Atlantic Steamer Supply Co. v. The SS Tradewind*, 153 F.Supp. 354, 363 (D.Md.1957):

That the necessaries are furnished to the vessel only when they are ordered for a particular vessel and thereafter are either actually put on board or brought within the control of the ship's officers is settled law.

*See also West Kentucky Coal Co. v. Dillman*, 15 F.2d 25, 27–28 (8th Cir.1926).

The Ninth Circuit, in a comparatively recent case virtually identical to the instant one, cited *Bankers Trust* as Second Circuit authority in support of its holding that containers leased in bulk to a fleet do not give rise to maritime liens on the individual vessels of the fleet. *See Foss Launch & Tug Co. v. Char Ching Shipping U.S.A., Ltd.*, 808 F.2d 697, 701 (9th Cir.), *cert. denied*, 484 U.S. 828, 108 S.Ct. 96, 98 L.Ed.2d 57 (1987). No other court of appeals has held to the contrary. Moreover, our interpretation of *Piedmont* is not lacking in scholarly support:

The importance of this Supreme Court statement is that the materialman will not be deemed to fulfill the obligations imposed by the Act by simply delivering the supplies to the owner and then leaving the owner free to redistribute them at his discretion.

---

1. This provision has been superseded without substantial change by 46 U.S.C. § 31342 (1988), effective January 1, 1989.

2 *Benedict on Admiralty* § 38, at 3–46 (7th ed. 1992).

*Bankers Trust* states the law of this circuit, and the district court's reliance upon *The Transmarine Barge No. 100*, 62 F.2d 252 (2d Cir.1932), which antedated *Bankers Trust*, is misplaced. *Transmarine* involved towage liens under an agreement pursuant to which the towed barges were divided into fleets, usually of five boats, and bills were submitted on the basis of total fleet tonnage, with each barge being allocated an equal share of the total charge. The towing company knew which barges comprised each fleet that it towed from point to point. Towage was furnished to those particular vessels in specified portions. That holding is consistent with our subsequent holding in *Bankers Trust*.

◼ Stare decisis principles aside, well-grounded policy considerations militate against the existence of maritime liens in cases such as the instant one. As a general rule, maritime liens are disfavored by the law. Because the maritime lien is a secret lien arising by operation of law, "[i]t may operate to the prejudice of prior mortgagees or of purchasers without notice. It is therefore *stricti juris* and will not be extended by construction, analogy or inference." *Piedmont*, 254 U.S. at 12, 41 S.Ct. at 4.

Unlike other security arrangements, the maritime lien is for the benefit of both the ship and its creditors. On the one hand, it enables ships to obtain repairs and supplies on its own account that might not otherwise be available. *Id.* at 9, 41 S.Ct. at 3. On the other hand, "it gives the creditor a special property in the ship, which subsists from the moment the debt arises, and it gives him a right to have the ship sold that his debt may be paid out of the proceeds of the sale. It is a right in the vessel, a jus in re." *The Poznan*, 9 F.2d 838, 842 (2d Cir.1925), *rev'd on other grounds sub nom. New York Dock Co. v. Steamship Poznan*, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 (1927).

◼ The concept of an *in rem* hypothecation will not work in the manner intended, however, if there is no identifiable ship to which the lien may attach when the obligation is created. This is illustrated by comparing *Piedmont* with the Supreme Court's subsequent decision in *Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.*, 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197 (1940). In the latter case, where the plaintiff agreed to satisfy the fuel oil requirements of any vessels chartered by the other contracting party, the Court distinguished *Piedmont* on the ground that the seller delivered the oil directly to two ships and invoiced it in each instance to the ship receiving the oil and its owners. *Id.* at 276–77, 60 S.Ct. at 941–42. In the instant case, no one knew to which ship a container would be assigned at any given time.

Holding, as we do, that plaintiffs may not claim maritime liens, we see no need to reach defendants' argument, made for the first time in this court, that, pursuant to specific terms in the Textainer and Textainer Special Equipment leases, their rights should have been construed in accordance with English law, which provides generally for actions *in rem* rather than maritime liens. *See Sembawang Shipyard, Ltd. v. Charger, Inc.*, 955 F.2d 983, 988 (5th Cir. 1992). However, apropos of plaintiffs' argument that maritime law should adapt itself to modern technology and practices, we find the House of Lords' decision in *The River Rima* [1988] 2 All E.R. 641, [1988] 1 W.L.R. 758, [1988] 2 Lloyd's Rep. 193, enlightening. In that case, as in the instant one, containers were leased to a shipowner with no reference as to delivery to, or carriage by specific ships. In denying the lessor's claim for *in rem* relief, Lord Brandon of Oakbrook, writing for the Court, said:

> There are two main kinds of contract pursuant to which goods or materials required for the operation of a ship may reach her. The first kind of contract is one which expressly provides that the goods or materials are required for the use of a particular ship, the identity of which is specified in the contract or will be specified by the time when the contract comes to be performed. The second kind of contract is one which contains no reference to a particular ship for

the use of which the goods or materials are required, leaving the shipowner to make his own decision about that later. The first kind of contract is, in my opinion, a contract under which goods or materials are "supplied to a ship" within the meaning of para (*m*) [the statute authorizing *in rem* relief]. The second kind of contract, however, is, in my opinion, not a contract for goods or materials to be "supplied to a ship" within the meaning of para (*m*). It is no more than a contract for the supply of goods or materials to a shipowner....

We are satisfied that the House of Lords arrived at the above conclusion with as full an awareness of modern maritime technology and practices as is possessed by the courts of this Country. Despite plaintiffs' lamentations, there is nothing in the record to indicate that the container industry has suffered as a result of the decisions in either *River Rima* or *Foss Launch, supra.*

In sum, we hold that the container lessors herein did not "furnish" the containers "to any vessel," as the Maritime Lien Act requires. The judgment of the district court appealed from herein is reversed.