INTEGRAL CONTROL SYSTEMS CORP., Kennedy Coatings Company, CJP Marine Service and Drydock Co., Inc. and Argo Industrial, a Division of Argo International Corp., Plaintiffs,

v.

CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., *In Personam,*

and

The BARGE "ENLIGHTENED ENER-GY" previously known as the "Leo Frank," her engines, machinery, tackle, fittings, equipment, and appurtenances.

In Rem, Defendants and Third–Party Plaintiffs,

v.

STANDARD MARINE TRANSPORT SER-VICES, INC., and First Marine Ship-yard, Inc., Third–Party Defendants.

No. 94 Civ. 4769(CSH).

United States District Court, S.D. New York.

Jan. 9, 1998.

Cappiello, Hofmann & Katz, P.C., Paul T. Hofmann, of counsel, New York, NY, for plaintiffs Integral Control Systems Corp. and Kennedy Coatings Company.

Charles E. McTiernan, Jr., Lawrence S. Menkes, Thomas J. Puppa, of counsel, New York, NY, for defendant and third-party plaintiff Consolidated Edison Company of New York, Inc.

Peter Frank, Staten Island, NY, for third-party defendants Standard Marine Transport Services Inc. and First Marine Shipyard, Inc.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

This admiralty action arises out of work performed upon a vessel under a contract between the shipowner and a shipyard. The shipyard subcontracted with other companies, including the plaintiffs, to do parts of the work. The shipyard having failed to pay them, plaintiffs commenced this action against the shipowner *in personam* and, asserting the existence of maritime liens for their work, against the vessel *in rem*. The shipowner filed third-party claims against the shipyard, which in turn alleged counterclaims against the other parties. Full discovery has been accomplished.

The Court is now required, on cross-motions for summary judgment, to determine the existence *vel non* of maritime liens in favor of plaintiffs and against the vessel. Summary disposition is also sought with respect to various claims asserted by the shipyard.

### BACKGROUND

Defendant and third-party plaintiff Consolidated Edison Company of New York, Inc. ("Con Ed"), the utility company, maintains a generation station at the foot of 59th Street on the East River in Manhattan. The station is powered by fuel oil. Until 1993, Con Ed owned and utilized three oil tank barges, moored in the river at 59th Street, to supply the station. In that year Con Ed purchased another tank barge to replace them. This was the barge "LEO FRANK," which Con Ed renamed the "ENLIGHTENED ENERGY" (hereinafter "the vessel").

By contract dated August 16, 1993, Con Ed bought the vessel from third-party defendant Standard Marine Transport Services, Inc. ("SMT"). SMT had used the vessel for the transport and ocean dumping of municipal sewage sludge. That useful but humble occupation required that the vessel undergo substantial work to convert her into a suitable storage facility for Con Ed's fuel oil. Also on August 16, 1993, Con Ed entered into a contract with third-party defendant First Marine Shipyard, Inc. ("FMS") to perform all conversion work on the vessel speci-

fied by Con Ed for a firm lump sum price of $950,000.

When these contracts were executed, the vessel was located at FMS's shipyard on Staten Island, where the conversion work was to be performed. That work included the replacement or renewal of steel members comprising the vessel's hull and cargo tanks; the installation of different equipment, machinery and fittings; and the cleaning and repainting of the vessel's interior and exterior.

Con Ed required SMT to guarantee FMS's full performance of its obligations under the conversion contract. That requirement reflected Con Ed's concern, which proved to be prescient, about FMS's ability to perform; since 1991 FMS had been operating under the supervision of the Bankruptcy Court for the Eastern District of New York. *In re First Marine Shipyard, Inc.*, Dkt. No. 191–11441–352 (Bkptcy.E.D.N.Y.).

Peter Frank is the president of both SMT and FMS. Frank is also an attorney.

The conversion contract between Con Ed and FMS (also referred to as "the Purchase Order") provided that FMS would "[f]urnish all supervision, labor and materials to convert the Leo Frank Barge for the storage of No. 6 fuel oil" in accordance with Con Ed's specifications. ¶ 1. The contract also provided at ¶ 36:

> The Contractor [FMS] shall be an independent contractor in the performance of the services hereunder. No right of supervision, requirement of approval or other provision of the Purchase Order and no conduct of the parties shall be considered to create a relationship of principal and agent, partners, or joint venturers between the parties, or joint employers of the Contractor's employees. Unless specifically provided elsewhere herein, nothing contained in the Purchase Order is intended for the benefit of any third parties.

The conversion contract provided that the $950,000 lump sum figure payable by Con Ed to FMS would in practice be disbursed in the form of monthly progress payments, with 15% of each approved invoice being withheld as security for FMS's proper performance of the contract.

During September, October and November, 1993, FMS entered into a number of subcontracts for the performance of portions of the work called for by the conversion contract between FMS and Con Ed. The plaintiffs at bar are all subcontractors, as follows: Kennedy Coatings Company ("Kennedy"), surface preparation and painting; CJP Marine and Drydock Co, Inc. ("CJP"), welding services and equipment; Argo Industrial ("Argo"), supplying two fuel pumps to the vessel; and Integral Control Systems, Inc. ("Integral"), electrical and lighting equipment.

A time came when FMS fell behind on its payments to these subcontractors. They importuned FMS for payment, to no avail. On June 28, 1994, Integral and Kennedy commenced this action against Con Ed *in personam* and the vessel *in rem* to collect their unpaid invoices. The Marshal arrested the vessel. Con Ed claimed the vessel, bonded her free of arrest, answered the complaint, and filed third-party complaints against SMT and FMS.[1] CJP and Argo intervened as additional parties plaintiff. However, their claims were subsequently discontinued by stipulation. The remaining plaintiffs are Integral and Kennedy.

The present pleadings may be summarized thus. Integral and Kennedy assert claims for their unpaid invoices against Con Ed *in personam*, the vessel *in rem*, and FMS. Con Ed asserts third-party claims against SMT and FMS. FMS asserts counterclaims against Con Ed, Integral, and Kennedy.

Following extensive discovery, these motions are now before the Court:

(a) Plaintiffs Integral and Kennedy move against Con Ed for partial summary judgment and declaratory relief, adjudicating that they have maritime liens against the vessel; and for summary judgment against FMS on

---

1. Con Ed obtained from the bankruptcy court in the Eastern District an order lifting the automatic stay in the FMS proceedings so that Con Ed could press its third-party complaint against FMS in this action.

their claims against FMS and dismissing FMS's counterclaims against them.

(b) Con Ed cross-moves for summary judgment dismissing plaintiffs' *in rem* claims against the vessel on the ground that no maritime liens exist; and for summary judgment dismissing FMS's counterclaims against Con Ed.

## DISCUSSION

### I. The Maritime Liens Claimed by Plaintiffs

█ Plaintiffs Integral and Kennedy have invoked the Court's admiralty jurisdiction by proceeding against the vessel *in rem.* They procured the arrest of the vessel by the Marshal pursuant to Rule C, Supplemental Rules for Certain Admiralty and Maritime Claims, which provides in pertinent part that "[a]n action *in rem* may be brought: (a) To enforce any maritime lien ..." Rule C(1)(a). It is well settled that the existence of a maritime lien is the *sine qua non* for an *in rem* proceeding in admiralty. "A maritime lien is the necessary basis for every admiralty proceeding *in rem.*" 2 *Benedict on Admiralty* (7th ed.rev.1997) at § 21, p. 2–3 (footnote omitted). "In American jurisprudence the existence of a maritime lien is synonymous with the availability of a liable *in rem.*" Gilmore and Black, *The Law of Admiralty,* (2nd ed.1975) at 622. For that proposition Gilmore and Black cite *The Rock Island Bridge,* 73 U.S. (6 Wall), 213, 215 , 18 L.Ed. 753: "The lien and the proceeding *in rem* are, therefore, correlative—where one exists, the other can be taken, and not otherwise."

█ The question therefore arises whether Integral and Kennedy, as subcontractors from FMS, can assert maritime liens against the vessel for their services.

In the United States, the question of who may assert a maritime lien against a vessel for services rendered to that vessel is addressed by the Maritime Commercial Instruments and Liens Act of 1988. The provisions pertinent to the case at bar are codified at 46 U.S.C. §§ 31341–31342.

§ 31341 provides:

(a) the following persons are presumed to have authority to procure necessaries for a vessel:

(1) the owner;

(2) the master,

(3) a person entrusted with the management of the vessel at the port of supply; or

(4) an officer or agent appointed by—

(A) the owner;

(B) a charterer;

(C) an owner pro hac vice; or

(D) an agreed buyer in possession of the vessel

(b) A person tortiously or unlawfully in possession or charge of a vessel has no authority to procure necessaries for the vessel.

§ 31342 provides:

(a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or person authorized by the owners—

(1) has a maritime lien on the vessel;

(2) may bring a civil action in rem to enforce the lien; and

(3) is not required to allege or prove in the action that credit was given to the vessel.

(b) This section does not apply to a public vessel.

"46 U.S.C. sections 31341 through 31342 recodify that part of the Maritime Lien Act previously found at sections 971 through 974." 2 *Benedict on Admiralty* (7th ed. rev. 1997), at § 35 p. 3–18. 46 U.S.C. §§ 971–974 formed part of the Federal Ship Mortgage and Maritime Lien Act of 1920; the provisions relevant to the furnishing of necessaries to vessels were substantially equivalent to those contained in the Federal Maritime Lien Act of 1910, which was the first Congressional enactment in the field. *See* Historical Note to 46 U.S.C. § 971 (West's 1975). Accordingly the cases interpreting the statutory scheme prior to the 1988 recodification remain instructive.

Under the statutory scheme, a party claiming a maritime lien against a vessel "must show that it (1) furnish[ed] repairs, supplies, or other necessaries, (2) to any vessel, (3)

upon the order of the owner of such vessel, or of the person authorized by the owner." *Port of Portland v. M/V Paralla,* 892 F.2d 825, 827 (9th Cir.1989) (citations and internal quotation marks omitted).

In the case at bar, there is no dispute that the barge Con Ed purchased and FMS contracted to convert was a "vessel," or that the services rendered to the vessel by Integral and Kennedy constitute "necessaries" as that word is used in the lien statute. Accordingly the case turns upon whether these plaintiffs can show, as they must, that they rendered their services to the vessel "on the order of the owner or person authorized by the owner," that is to say, Con Ed.

Plaintiff's difficulty arises from the undisputed fact that they contracted to render these services not with Con Ed, but with FMS. Furthermore, it is difficult for plaintiffs to argue that Con Ed appointed FMS as its agent to order their services for the account of the vessel, since the contract between Con Ed and FMS specifically provided that FMS was an "independent contractor," and that nothing in the contract or the parties' conduct thereunder "shall be construed to create a relationship of principal and agent, partners, or joint venturers between the parties . . ."

Plaintiffs were, in short, subcontractors from FMS; and there is a considerable body of law supporting the proposition that a subcontractor cannot assert a maritime lien against a vessel. 2 *Benedict on Admiralty* (7th ed. rev.1997) at § 40, p. 3–40 n. 10, cites *The Juniata,* 277 F. 438, 441 (D.Md.1922), for the observation that "because it can rarely be shown that the contractor was acting not as a contractor but as the agent of the owner, a subcontractor will normally not be entitled to a lien since he extends credit to the contractor and not to the ship." In *The Juniata,* the district court rejected a welding subcontractor's claim of a maritime lien against the vessel, which the subcontractor asserted after the contractor with which it had dealt went bankrupt. The court reasoned that the shipowner made its bargain with the contractor and the contractor was not acting as the vessel's agent when it subcontracted for the welding work. With re-

spect to the governing statute, the court noted that "Congress was at pains . . . to enumerate the persons who shall be presumed to have authority from the owner to procure repairs, supplies, and other necessaries, and, among persons so enumerated, contractors for ship repairs are not mentioned." 277 F. at 441.

In *Port of Portland,* 892 F.2d at 828, the Ninth Circuit said that "[i]t is the general rule that a general contractor does not have the authority to bind a vessel," citing for that proposition its prior ruling in *Farwest Steel Corp. v. Barge Sea–Span 241,* 828 F.2d 522, 526 (9th Cir.1987), *cert. denied,* 485 U.S. 1034, 108 S.Ct. 1594, 99 L.Ed.2d 909 (1988), in which the court of appeals stated:

> [W]here subcontractor suppliers have sought maritime liens, courts interpreting section 972 have uniformly held that the general repair contractor was not endowed with sufficient "management" authority to support a section 971 lien.

In *Port of Portland,* a shipowner retained Northwest Marine Ironworks, Inc. to convert the owner's vessel. The shipowner's contract with Northwest "expressly provided that Northwest was not the owner's agent and could not incur liens on behalf of the vessel." 892 F.2d at 828 (footnote omitted). While it was apparent that Northwest would have to use certain port facilities in accomplishing the conversion of the vessel, Northwest's agreement with the shipowner "made no mention of the Port [of Portland] and did not direct that the Port's facilities be used." *Id.* at 826. Northwest and the Port then entered into an agreement whereby the Port provided facilities for the former's use for the vessel conversion project. Northwest then went into bankruptcy and the Port asserted a maritime lien against the vessel for the services it had rendered.

The district court denied the claim, holding that the Port "failed to prove that it supplied services upon the order of the owner of the vessel or upon the order of the person authorized by the owner." 892 F.2d at 829. The Ninth Circuit affirmed, on the basis of the general rule previously quoted. While the court of appeals acknowledged the possibility that "an owner can still become responsible

for the services of a subcontractor, if the owner has ordered the general contractor to retain that subcontractor," *id.* at 828, the Port had failed to make that showing. "The most the Port has shown is the fact that it was most likely, even perhaps rather certain, that Northwest would choose the facilities of the Port when it did its work. That alone does not constitute a direction or requirement to use those services." *Id.* Other cases denying a subcontractor a maritime lien for necessaries furnished to a vessel are collected in 2 *Benedict on Admiralty* (7th ed. rev. 1997) at § 40, p. 3–40 n. 10, and in pages 18–20 of Con Ed's main brief.

Plaintiffs, contending for the existence of a maritime lien in their favor, place primary reliance upon a decision of the Eleventh Circuit, *Marine Coatings of Alabama, Inc. v. United States,* 932 F.2d 1370 (11th Cir.1991). The editors of *Benedict on Admiralty* apparently regard the *Marine Coatings* case as running counter to the line of cases holding that a subcontractor has no maritime lien; the citation to *Marine Coatings* in the encyclopedic collection of cases appearing in footnote 10 at page 3–40 of volume 2 of the 1997 revised edition is preceded by the telltale notation "but see." These words indicate that the "cited authority directly states or clearly supports a proposition contrary to the main proposition." *The Bluebook—a Uniform System of Citation* (16th ed.1996) at 23.

*Marine Coatings* arose out of repair services furnished to U.S. Naval vessels. The government entered into a contract with Braswell Shipyards, Inc. to perform the repairs. Braswell thereafter subcontracted with plaintiff MCI for the painting, cleaning and coating of the vessels. After Braswell went into bankruptcy, MCI commenced an action against the United States *in personam*, on the theory that it had maritime liens against the vessels for its services.[2] The district court granted summary judgment in favor of the government, on the ground, *inter alia*, that Braswell was not authorized by the United States as owner of the vessels to procure MCI's services, as required by the lien statute, so that "MCI would not have

been entitled to a maritime lien on the vessels if they had been privately owned." 932 F.2d at 1373–74.

The Eleventh Circuit reversed the grant of summary judgment and remanded the case for trial. The court of appeals reasoned that the statute's list of persons presumed to have the authority to act for a shipowner in ordering necessaries "is not a *conclusive* presumption.... Accordingly, it is reasonable to conclude that persons falling outside the class of persons presumed to have authority might still have had authority to procure repairs; there merely is no presumption of such authority." 932 F.2d at 1376. The court of appeals detected triable issues of fact on that subject, reciting record evidence that the government was aware of MCI's performance; that on previous jobs Braswell had submitted a list of subcontractors which included MCI; that MCI's work on the vessels in question was largely performed; and that government officials were well aware of MCI's presence and directly inspected MCI's work, often without any Braswell officials present. 932 F.2d at 1376 n. 9.

In a subsequent case, *Bonanni Ship Supply, Inc. v. United States,* 959 F.2d 1558 (11th Cir.1192), the Eleventh Circuit rejected a subcontractor's claim of a maritime lien, distinguishing *Marine Coatings* on the facts. The subcontractor in *Bonanni* did not suggest that the government had knowledge of the work it performed on the government's vessel, "maintaining only that because Bonanni performed the work and because the Government ultimately paid for that work, that it was a maritime lienor under the MCILA," 959 F.2d at 1565, a contention which the court of appeals rejected. The Eleventh Circuit distinguished its prior holding in *Marine Coatings* as follows:

> This case is entirely different from *Marine Coatings.* In that case, the court determined that the following facts alleged by the plaintiff created a genuine issue of material fact regarding whether the plaintiff subcontractor was a maritime lienor under the MCILA: (1) two of the three job orders submitted by the prime contractor

---

**2.** MCI proceeded in that fashion because of the particular jurisdictional requirements involved in

suing the government, a subject which I need not explore in this case.

referenced the plaintiff in a list of subcontractors; (2) the subcontractor performed approximately 40% of the total work on the subject vessels; (3) Government officials were well aware of the subcontractor's presence and directly inspected the subcontractor's work, often in the absence of any representatives of the prime contractor; and (4) Government representatives maintained offices on the prime contractor's premises, and gave provisional and final approval to work performed by the contractor. *Marine Coatings*, 932 F.2d at 1376 n. 9.

The factors just quoted appear to be sufficient in the eyes of the Eleventh Circuit to give rise to a maritime lien against a vessel, or at least to raise a triable issue of fact on the point. But it seems to me clear enough that the Eleventh's Circuit's view is contrary to the general rule that a subcontractor cannot assert a maritime lien; *Marine Coatings* deserves the cautionary "but see" which the editors of *Benedict on Admiralty* applied to the decision. After all, one would expect the factors upon which the Eleventh Circuit focused to be present in most cases where the owner of a vessel places her into the hands of a general contractor for substantial repair or conversion, except in the unlikely circumstance of an owner who disappears from the work site, leaves no agent behind, and does not return until the work has been completed.

The Second Circuit does not appear to have considered the existence *vel non* of a subcontractor's maritime lien. The most recent Second Circuit opinion on maritime liens revealed by the parties' research and my own is *Itel Containers International Corp. v. Atlanttrafik Express Service, Ltd.*, 982 F.2d 765 (2d Cir.1992), which rejected the maritime lien claims of a supplier of cargo containers to a shipping line. The court of appeals summarized the transaction at 982 F.2d at 766: "Consistent with industry practice, the containers were delivered in bulk and were not designated for use on any particular ship." In these circumstances, the Second Circuit held that the container suppliers had no maritime lien against the vessels in the owner's fleet, a decision flowing direct-

ly from *Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries*, 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920), where the Supreme Court reached the same conclusion with respect to a supplier of coal to a fish oil factory and a fleet of ships, and its progeny. *See* 982 F.2d at 767.

During its discussion in *Itel*, the Second Circuit quoted *Piedmont*, 254 U.S. at 12, for the proposition that "[b]ecause the maritime lien is a secret lien arising by operation of law, it may operate to the prejudice of prior mortgagees or of purchasers without notice. It is therefor *stricti juris* and will not be extended by construction, analogy or inference." 982 F.2d at 768 (internal quotation marks omitted).

While *Itel* did not involve a subcontractor, it articulates the Second Circuit's current commitment to a *stricti juris* approach to maritime liens. Because it seems clear that the Eleventh Circuit's more expansive approach in *Marine Coatings* is outside the mainstream of American admiralty jurisprudence, *Itel* cautions against its adoption by district courts in this circuit, and I decline to do so.

That is fatal to the present plaintiffs' lien claims, since the participation and knowledge of Con Ed in the subcontracting and work-performance aspects of the vessel's conversion were no more immediate or direct than those which the Eleventh Circuit, navigating outside the mainstream, was prepared to accept as sufficient in *Marine Coatings*. I think that the exception to the general rule is more accurately stated by the Ninth Circuit in *Port of Portland*, 892 F.2d at 826 ("an owner can still become responsible for the services of a subcontractor, if the owner has ordered the general contractor to retain that subcontractor."). This is not such a case. The affidavits and depositions, discussed in Con Ed's opposing brief at 10–18, show that Con Ed did not require FMS to hire Integral and Kennedy. FMS selected Integral and Kennedy as entities known to it from prior projects.

Accordingly summary judgment will enter in favor of Con Ed dismissing the claims of Integral and Kennedy against the vessel *in rem*.

These plaintiffs have also sued Con Ed *in personam*. The parties have not briefed the viability of those claims, and I make no present order with respect to them.

## II. *The Claims of FMS*

### *Claims Involving Con Ed*

In addition to responding to the complaint of the subcontractor plaintiffs, Con Ed filed a third-party complaint against SMT and FMS. FMS has asserted two counterclaims and two affirmative defenses against Con Ed.

The first counterclaim alleges that Con Ed wrongfully terminated its conversion contract with FMS, and that as a result "FMS was damaged in an amount in excess of $5,000,-000." FMS answer and counterclaims at ¶ 6.

FMS asserts a second claim against Con Edison, although it is inappropriately captioned the "second affirmative defense" rather than an additional counterclaim. *Id.* at ¶¶ 12–13. FMS there alleges it properly performed all the contracted-for work on the vessel, and should accordingly be awarded the amount of $900,000 in *quantum meruit*.[3]

The conversion contract between Con Ed and FMS at ¶ 18 obligated FMS to "defend, indemnify and save Con Edison ... harmless from all claims, damages, loss and liability ... resulting, in whole or in part, from, or connected with, the performance of the Purchase Order by the Contractor, any subcontractor, their agents, servants, or employees." Con Ed, having been appraised of the intention of Integral and Kennedy to arrest the vessel, wrote to Peter Frank as president of FMS on June 30, 1994 to remind FMS of that obligation, and to demand "that First Marine inform it in writing by 12:00 noon on July 1, 1994 of the measures First Marine intends to take to comply with this contract requirement and indemnify and save Con Edison harmless from the above mentioned liens and arrest of the Enlightened Energy."

Frank replied under date of July 1, 1994, stating in substance that money would solve all these problems; calling upon Con Edison to "advance some of the money due and overdue to First Marine in connection with the work that it has done," and concluding: "I do not believe First Marine Shipyard has either the standing or ability to obtain a modification of the Federal Court's Order [of arrest] or to post a bond."

Con Ed regarded that response as a violation by FMS of its quoted obligations under the conversion contract, and, in a letter dated July 8, 1994, advised FMS and SMT that it had canceled the contract. The vessel was removed from FMS's yard and the conversion work completed elsewhere.

These circumstances leave Con Ed and FMS (together with SMT as guarantor of FMS's performance) quarreling about whether FMS owes Con Ed money for failing to perform the work properly, or Con Ed owes FMS money for improperly terminating the contract, failing to make periodic payments as required by the contract, and failing to honor an invoice for additional steel work not covered by the original contract (a proposition that Con Ed disputes).

█ Even though the amount of $5,000,000 pleaded in FMS's first counterclaim must be regarded as fanciful, the contentions of the parties give rise to issues of fact which preclude summary disposition, except for FMS's claim for additional steel work, to which I now turn.

It is common ground that the conversion contract obligated FMS to "furnish all supervision, labor and materials to convert the Leo Frank barge for the storage of No. 6 fuel oil in accordance with Con Edison's specification MS–93–0306." Under the caption "Compensation" the conversion contract provided:

> For the above work scope Con Edison will pay First Marine a firm lump sum in the amount of $950,000. This price is exclusive of all sale and use taxes and includes all overtime to complete the project in 120 calendar days.

---

**3.** FMS's second counterclaim against Con Ed is one for indemnity in the event that the plaintiff subcontractors succeed in their action against FMS. FMS's first affirmative defense pleads a lack of jurisdiction in this Court because of FMS's bankruptcy proceeding in the Eastern District. As noted *supra*, Con Ed obtained the permission of the bankruptcy court to proceed against FMS on its third-party complaint in this Court.

Con Ed's specification MS–930306, incorporated by reference in the conversion contract, provided in part:

This section will address the structure components of the vessel.

7.1 All steel components shall be gauged and shall be placed into a matrix showing areas of thinning and non conforming. It will follow a three (3) belts setup.

7.2 All undersized metal shall be removed and structure reestablished to match new condition.

By accepting this specification as part of the conversion contract, FMS clearly agreed to replace whatever "undersized metal" might be revealed by the gauging process, thereby returning the vessel to a "new condition"; and that such work would be included in the $950,000 lump sum compensation. Of course, the amount of "undersized metal" that would eventually be revealed was not fully apparent at the time of contracting, but that is a risk that FMS assumed. FMS does not suggest any basis for a different contractual interpretation.

■ Notwithstanding this summary disposition at FMS's extra work claim, it is not clear on the present record that no disputed issues of fact exist with respect of FMS's first counterclaim against Con Ed. Accordingly Con Ed's motion for summary judgment dismissing that counterclaim is denied.

I reach a different conclusion with respect to FMS's *quantum meruit* claim.

■ The case at bar falls within the established rule that "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark–Fitzpatrick, Inc. v. Long Island Railroad Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 516 N.E.2d 190 (Ct.App.1987) (citations omitted). As the New York Court of Appeals went on to explain in *Clark–Fitzpatrick:* "A 'quasi contract' only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a

party's unjust enrichment." *Id.* (citations omitted). *Quantum meruit* is a remedy that the law fashions to prevent unjust enrichment; but it is not available if the rights and obligations of the parties are governed by a valid and enforceable written contract. *See Unisys Corp. v. Hercules, Inc.*, 224 A.D.2d 365, 638 N.Y.S.2d 461, 463 (1st Dept.1996) ("Without in some manner removing the express contract from the picture in the normal fashion (rescission abandonment, etc.) it is not possible to ignore it and proceed in *quantum meruit.*") (citations and internal quotation marks omitted).

■ In the case at bar, FMS is proceeding under its written contract with Con Ed, claiming that the latter breached that contract with consequent economic loss to FMS. This is the thrust of FMS's first counterclaim against Con Edison. FMS cannot also claim in *quantum meruit.* Accordingly summary judgment will be granted to Con Ed dismissing that claim.

*Claims Involving FMS, Integral and Kennedy*

In their motion papers, Integral and Kennedy seek partial summary judgment against FMS for unpaid invoices, and summary judgment dismissing counterclaims asserted by FMS against Integral and Kennedy.

The motion papers do not clearly reveal the status of the pleadings as between these three parties. For example, the exhibits submitted in support of Integral and Kennedy include a copy of their original complaint against Con Ed and the vessel, but that pleading does not assert any claims against FMS. Nor does review of the Court file resolve the uncertainty.

Accordingly the Court reserves judgment on the motions of Integral and Kennedy for relief against FMS. That matter will be on the agenda of the next status conference in the case.

For the foregoing reasons, the Court makes the following directions:

The motion of Consolidated Edison Company of New York, Inc., as claimant of the Barge "ENLIGHTENED ENERGY," for summary judgment dismissing the complaint

of plaintiffs Integral Control Systems Corp. and Kennedy Coatings Company against that vessel *in rem* is granted.

Con Ed's motion for summary judgment dismissing the first counterclaim asserted against it by third-party defendant First Marine Shipyard, Inc. is denied. That motion is granted as to the claim pleaded in FMS's "first affirmative defense."

Decision is reserved on the motions for summary judgment addressed by Integral and Kennedy against FMS.

It is SO ORDERED.