339 F.3d 76
 PATRICIA HAYES ASSOCIATES, INC., Smithall Electronics, Inc., Southern Marine Electric Co., Inc., Alpha Marine, Inc., Nordica Engineering, Inc., Callenberg Engineering, Inc., Tramp Oil & Marine Ltd, Triton Marine Fuel Ltd, the Boston Pilots, Arthur Whittemnore, Capt., L.J. Cannon, R.B. Emery, R. Stover, J. Collins, C. Hoyt, J.S. Cardomy, R.P. Cushman, J.E. Frye, Jr., R.G. Cordes, F.R. Morton, G.H. Farmer, Massachusetts Port Authority, P & O Ports North American Inc., Starboard Holdings Ltd., David Leonard, John Hadley, Howard McVay, Bruce Fisher, Joseph Maco, Irving Bracy, Spin, Inc., Clean Water of New York, Inc., Consolidated-Plaintiffs,
Dynamic Marine Electric, Inc., Assurnaceforeningen Skuld, High Seas Trading Co., Direct Ship Supply, Steiner Transocean Ltd, Metropolitan Pilots Association, Moran Towing and Metropolitan Pilots Association, Milder Medical Supply, Inc., Jim's Pump Repair, Inc., Sysco Foods of South Florida, Inc., Ritter Sysco Foods, Inc., Mayfair Ship Supplies, Inc., Intervenors-Plaintiffs,
Greenwich Insurance Co., NAC Insurance Corp., Intervenors-Plaintiffs-Appellants,
Four Jay's of Merritt Island, Inc., Intervenors-Plaintiffs,
v.
CAMMELL LAIRD HOLDINGS U.K., Premier Cruise Lines, Ltd., Premier Holdings, Inc., Consolidated-Defendant-Appellee,
"Big Red Boat II", its engines, tackle, apparel and freights in rem, International Shipping Partners, in personam, Premier Cruises, Inc., in personam, MV "Big Red Boat II", Master Garnishee, Defendants-Appellees.
 Docket No. 02-7761.
 United States Court of Appeals, Second Circuit.
 Argued: March 17, 2003.
 Decided: August 5, 2003.
 
 Terry L. Stoltz, Nicoletti Hornig Campise Sweeney & Paige (Kevin J. O'Malley, on the brief), New York, NY, for Intervenors-Plaintiffs-Appellants.
 Shaun F. Carroll, Nourse & Bowles (Katharine F. Newman, on the brief) New York, NY, for Defendants-Appellees.
 Before: FEINBERG, F.I. PARKER, and SOTOMAYOR, Circuit Judges.
 F.I. PARKER, Circuit Judge.
 
 
 1
 Intervenors-plaintiffs-appellants Greenwich Insurance Co. and NAC Insurance Co. ("Sureties") appeal the order of the United States District Court for the Southern District of New York (George B. Daniels, Judge), entered on June 3, 2002, denying Sureties' motion to intervene in an action — filed by other plaintiffs, none of whom are a party to this appeal — against the Big Red Boat II ("BRBII"). The complaint accompanying Sureties' motion to intervene alleged that Sureties had maritime liens against BRBII, and that Sureties were entitled to enforce those liens in rem against BRBII. The district court denied Sureties' motion to intervene, and Sureties now appeal. For the reasons set forth herein, we conclude that there was no abuse of discretion in the district court's decision to deny Sureties' motion to intervene. Therefore we affirm.
 
 
 I. BACKGROUND
 
 
 A. The Arrest of the Big Red Boat II
 
 
 2
 On September 14, 2000, Patricia Hayes & Associates, Inc. ("Hayes") and Smithall Electronics, Inc. ("Smithall") filed complaints against the BRBII, International Shipping Partners ("ISP"), Premier Cruises, Inc. ("Premier") and the Master of the BRBII (collectively "the defendants"). Hayes and Smithall alleged that they possessed maritime liens against BRBII and therefore were entitled to a warrant of arrest pursuant to Supplemental Rule C ("Admiralty Rule C") of the Federal Rules of Civil Procedure ("FRCP"). On September 15, 2000, two other plaintiffs, Southern Marine Electric Company, Inc. ("Southern Marine") and Alpha Marine, Inc. ("Alpha Marine"), filed similar complaints against the defendants.
 
 
 3
 On September 15, 2000, the district court signed the warrants of arrest requested by Hayes, Smithall, Southern Marine and Alpha Marine, and ordered the clerk of the court to issue a warrant of arrest and a writ of maritime attachment against BRBII. Although BRBII was out of the jurisdiction at the time of the warrant was signed, the vessel arrived in the district on Saturday, September 16, 2000. When BRBII entered the district, the United States Marshals seized it.
 
 
 4
 After the arrest of the vessel, numerous other complaints and intervening complaints were filed against defendants. The various complaints allege that each plaintiff provided goods or services that were defined as necessaries under maritime law and were therefore entitled to a maritime lien against BRBII, as well as other relief. Sureties filed their motion to intervene at this time.
 
 
 5
 On September 28, 2000, the district court signed an order consolidating all claims filed against defendants and granting motions to intervene as to those claims uncontested by defendants. After the bulk of the claims against BRBII were settled, and BRBII's owners arranged for security to satisfy the remaining contested claims against the vessel, the district court signed an order releasing BRBII from arrest on November 10, 2000.
 
 
 6
 
 B. Sureties' Claims Against the Big Red Boat II
 
 
 
 7
 Sureties' claims against BRBII were based on and related to a bond Sureties issued to Premier. Premier did not own BRBII; it had chartered BRBII from the boat's owners (Big Red Boat(Two) Ltd.) and operated BRBII as part of its own fleet of vessels. In order to carry passengers for hire from U.S. ports, Premier was legally obligated to provide evidence of financial responsibility to establish that it could refund any unearned passenger deposits. See 46 U.S.C.App. § 817e; 46 C.F.R. §§ 540.3, 540.22. To fulfill this legal requirement, Premier arranged for Sureties to post a Federal Maritime Commission Passenger Vessel Surety Bond (the "FMC Bond"). The FMC Bond covered Premier's whole fleet of six vessels, and was limited to a total coverage amount of $15 million. Coverage for any individual ship was limited to $5 million. As consideration for the issuance of the FMC Bond, Premier agreed to pay a premium and to indemnify Sureties for all "losses, costs and expenses, including reasonable attorney's fees" incurred under the FMC Bond. Premier posted cash collateral in the amount of $3.7 million as security for the indemnification provision.
 
 
 8
 In the fall of 2000, Premier ceased operations. At the time, Premier had collected passenger ticket deposits of $2,310,028.44 for future trips of BRBII which were canceled when Premier ceased operations. In addition, several BRBII voyages which had been scheduled for the Summer of 2000 were never performed due to operational or mechanical difficulties. Sureties claimed, in their complaint, that they were exposed to potential liability of up to $5 million — the coverage limit for any single boat under the FMC Bond. However, at no point prior to the district court's denial of Sureties' motion to intervene in June 2002 did Sureties actually pay any claims under the FMC Bond.[1]
 
 
 9
 In their intervening complaint, Sureties contend that they had claims against BRBII because: 1) they were subrogated to the maritime lien rights of any passengers who made claims against the FMC Bond; and 2) they were entitled to a maritime lien because the FMC Bond was a maritime contract and/or a necessary provided to BRBII. The district court denied Sureties' motion to intervene after concluding that "the bond between Sureties and Premier is not a maritime contract and, thus, Sureties cannot assert a maritime lien against the vessel." Hayes v. M/V Big Red Boat II, No. 00 Civ. 6925(GBD), 2002 WL 1163555, at *4 (S.D.N.Y. May 31, 2002). The court also concluded that:
 
 
 10
 [e]ven if this Court were to find that the bond is a maritime contract, Sureties could not prevail. Sureties have not demonstrated that they have actually paid out any claims, nor that the claims against the BRB[II] exceed the $3.7 million collateral provided by Premier.
 
 
 11
 Id. at *4 n. 4.
 
 II. DISCUSSION
 
 12
 In their briefs and at oral argument, the parties focused primarily on the question of whether the FMC Bond is a maritime contract, and whether a maritime lien may attach as a result of payments made under such a bond. However, in the present case it is not necessary to reach — and therefore we do not decide — those issues, because nowhere in the motion to intervene, or in any of Sureties' subsequent filings and communications with the district court up until the time the district court denied the motion, did Sureties ever allege that they had paid any claims under the FMC Bond. Therefore, it was within the district court's discretion to decide whether or not to exercise jurisdiction over Sureties' claims, and the district court decided not to exercise jurisdiction. Sureties contend that, to the extent that the district court relied upon the prematurity of Sureties' claims as the basis for the court's denial of the motion to intervene,[2] that reliance was error. We disagree and, accordingly, affirm the district court's order.
 
 
 A. Standard of Review
 
 
 13
 This Court reviews "a District Court's denial of a motion to intervene, whether as of right or by permission, for abuse of discretion." In re Holocaust Victim Assets Litigation, 225 F.3d 191, 197 (2d Cir.2000). "A district court abuses its discretion when (1) its decision rests on an error of law . . . or a clearly erroneous factual finding, or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions." In re Fitch, Inc., 330 F.3d 104, 108 (2d Cir.2003) (per curiam) (internal quotation marks omitted).
 
 
 B. General Principles
 
 
 14
 In order to intervene in the action against BRBII, Sureties had to establish that they had the right to enforce a maritime lien against the vessel. See Local Admiralty Rule for the Southern District of New York E.2 ("When a vessel . . . has been arrested, attached or garnished, and is in the hands of the marshal . . . anyone having a claim against the vessel . . . is required to present the claim by filing an intervening complaint" that meets the requirements of FRCP 24); Admiralty Rule C ("An action in rem may be brought . . . to enforce a maritime lien."). Under FRCP 24(a), in order to intervene as of right in an action, "the applicant must: (1) file a timely motion; (2) show an interest in the litigation; (3) show that its interest may be impaired by the disposition of the action; and (4) show that its interest is not adequately protected by the parties to the action." In re Holocaust Victim Assets Litigation, 225 F.3d at 197.
 
 
 15
 As we explained in Itel Containers International Corp. v. Atlanttrafik Express Service Ltd., 982 F.2d 765 (2d Cir.1992):
 
 
 16
 A maritime lien is: "a special property right in the vessel, arising in favor of the creditor by operation of law as security for a debt or claim. The lien arises when the debt arises, and grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds." Id. at 766 (quoting Equilease Corp. v. M/V Sampson, 793 F.2d 598, 602 (5th Cir.1986) (en banc)).
 
 
 C. Analysis
 
 
 17
 Sureties claim that they had maritime liens against BRBII (and thus had an interest in the pending case against BRBII sufficient to justify intervention) for two reasons. First, Sureties contend that any amounts due under the FMC Bond that were attributable to the BRBII give rise to a maritime lien against BRBII. Second, Sureties claim that any passengers who paid to travel on BRBII but did not complete their trip were entitled to maritime liens against the ship, and Sureties, by paying those passenger claims, became subrogated to these maritime liens. The district court concluded that any potential claims Sureties might have against BRBII were premature because the "Sureties ha[d] not demonstrated that they ha[d] actually paid out any claims, nor that the claims against the BRB[II] exceed the $3.7 million collateral provided by Premier." Sureties contend that the district court erred by denying their motion to intervene on this basis for two reasons. First, Sureties argue that the district court improperly concluded that Sureties' claims were unripe. Alternatively, Sureties argue that even if the district court correctly determined that their claims were unripe, the court nonetheless abused its discretion by denying the motion to intervene. We consider and reject each of these arguments in turn.
 
 
 1. Sureties' Claims Were Unripe
 
 
 18
 Sureties argue that the district court erred by concluding that their claims were unripe without first allowing Sureties an opportunity to present evidence in support of their claims. We find this contention unpersuasive because it misstates the record — it is clear from the record both that the district court offered Sureties, and that Sureties accepted, several opportunities to supplement the record between the time the initial motion was filed and the time the motion was denied[3] (a period of more than a year and a half) — but, more importantly, because it misperceives the basis of the district court's denial of Sureties' motion.
 
 
 19
 The determination of whether Sureties' claims were ripe turns on the question of whether there were any amounts due under the contract (the FMC Bond) at the time of the motion to intervene. See Itel Containers, 982 F.2d at 766 ("[t]he lien arises when the debt arises"); see also id. at 768 (a maritime lien "gives the creditor a special property in the ship, which subsists from the moment the debt arises)" (quoting The Poznan, 9 F.2d 838, 842 (2d Cir.1925), rev'd on other grounds sub nom. New York Dock Co. v. Steamship Poznan, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 (1927)). Sureties' claims are for amounts that they allege they will be required to pay (without the contractually required indemnification from Premier) under the FMC bond. Therefore, Sureties' claims could not be ripe (i.e., Sureties could not have a maritime lien) until and unless Sureties paid money under the FMC Bond and Premier failed to indemnify Sureties for that payment.
 
 
 20
 There is no dispute about the fact that there were no amounts due under the contract at the time Sureties motion to intervene was denied. Sureties' motion to intervene and accompanying verified complaint alleged that Sureties would be required to make payments, but never alleged that any payments had been made. Sureties repeated this position in a number of communications with the district court that occurred after the motion to intervene was filed but before the motion was dismissed.[4] Even now Sureties do not contend that they had paid any claims by the time the district court denied the motion to intervene.
 
 
 21
 Thus, Sureties' claims were unripe not because Sureties failed to provide sufficient evidence to support their allegations, but rather because their allegations, taken as true, were insufficient to support their claim. Because Sureties had not paid any claims under the FMC bond by the time their motion to intervene was denied, there was no amount due under the contract at that time. Without a debt due, Sureties could not have a maritime lien to enforce against BRBII. Thus, we find no error in the district court's conclusion that Sureties' claims were unripe.
 
 
 22
 
 2. The District Court Did Not Abuse Its Discretion by Declining To Exercise Jurisdiction over Sureties' Claims
 
 
 
 23
 Next, Sureties contend that, even if their claims were unripe, the district court erred by denying the motion to intervene because a maritime claim may be filed even before there is a breach of a maritime contract, if it is clear that the contract will be breached. In support of this position, Sureties cite Greenwich Marine, Inc. v. S.S. Alexandra, 339 F.2d 901 (2d Cir.1965), and The Lassell, 193 F. 539 (E.D.Pa.1912). Sureties argue that the district court should have exercised jurisdiction over their claims because, even though they had not paid any claims at the time the motion to intervene was denied, the district court should have inferred, from the scope of the potential liability as documented in the number and amount of claims Sureties had received (though not paid) that Sureties would have mature claims within a reasonable period of time.
 
 
 24
 As an initial matter, we note that the cases Sureties cite stand only for the proposition that a district court may in some circumstances disregard the prematurity of a plaintiff's claim as a matter of discretion, not that a district court must ignore the prematurity of a claim. For example, in The Lassell, a case involving somewhat exigent circumstances, the district court declined to dismiss a claim that was premature when filed but certain to mature shortly (i.e., within a matter of hours). In support of this decision, the court explained that: "It is settled that a suit may sometimes be brought in admiralty before the cause of action accrues, and the prematureness of the proceeding will only affect the question of costs." See id. at 543 (emphasis added). In Greenwich Marine, this Court recognized the same principle while upholding the district court's decision to dismiss the plaintiff's claim as premature. See 339 F.2d at 905 ("the admiralty judge, who is asked to disregard the prematurity of plaintiff's claim, must be compared to the Chancellor `balancing the equities,' and we would be entitled to reverse him only if he clearly abused his discretion").
 
 
 25
 The question, then, is whether the district court abused its discretion by declining, on prematurity grounds, to exercise jurisdiction over Sureties' claims. In support of its decision to deny Sureties' motion to intervene, the district court cited both the fact that Sureties had yet to pay any claims, and the fact that Sureties held $3.7 million in cash collateral as security in the event that any claims were paid in the future.
 
 
 26
 In the circumstances of this case, we see no abuse of discretion in that decision. On January 22, 2001, Sureties represented to the district court that they "hope[d] to be in the position to start paying claims by the end of the first quarter of 2001," but by June of 2002, when the district court denied Sureties' motion, Sureties had yet to inform the court that they had paid even a single claim. Thus, the district court did not deny Sureties' motion until more than 21 months after the motion was filed, providing a substantial period of time for Sureties' claims to ripen. The absence of any claims payments by this time, supports the view that the nature and amount Sureties' claims against BRBII were insufficiently certain for adjudication at that time. Moreover, contrary to Sureties' contentions, there was (and, in fact, remains) a real possibility that Sureties might never have a claim against BRBII because even if Sureties were eventually required to pay some claims,[5] they might not be required to pay claims in excess of the cash collateral they held. Given the uncertain nature of Sureties' claim, we conclude that the district court did not abuse its discretion by declining to exercise jurisdiction over Sureties' claims.
 
 III. CONCLUSION
 
 27
 For the foregoing reasons, we conclude that there was no abuse of discretion in the district court's decision to deny Sureties' motion to intervene. Accordingly, the order of the district court is AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Sureties provided a number of estimates of the claims they expected to pay, but never claimed that they had actually paid any claims. In their brief to this Court, Sureties stated that: "By way of an offer of proof, Sureties submit that if this matter were returned to the district court for a full hearing, [they] could prove that bySeptember 2002" a number of claims had been paid. Intervenors'-Pls.'-Appellants' Br. at 20-21 (emphasis added). However, Sureties do not dispute the fact that, as of the time the district court denied their motion in June of 2002, no payments had been made under the FMC Bond.
 
 
 [2]
 Sureties contend that the district court's statement that "Sureties could not prevail" because they "have not demonstrated that they have actually paid out any claims, nor that the claims against the BRB[II] exceed the $3.7 million collateral" is merely dicta, and "not a holding that [their] claim . . . was not ripe." However, even if we were to accept this characterization of the language in footnote 4 of the district court's opinion, it is well established that this Court "may . . . affirm the district court's judgment on any ground appearing in the record, even if the ground is different from the one relied on by the district court."ACEquip Ltd. v. Am. Eng'g Corp., 315 F.3d 151, 155 (2d Cir.2003).
 
 
 [3]
 We find Sureties' counsel's statement at oral argument that Sureties never had a chance to put evidence into the record, and that Sureties' counsel "never went back after the motions were submitted" to supplement the record, and similar statements in Sureties brief and a letter to this Court,see Intervenors'-Pls.'-Appellants' Br. at 20; Letter from Terry L. Stoltz of March 28, 2003, to be not only inaccurate, but misleading. In fact, the record indicates that Sureties communicated with the district court at least six times to provide updates on the status of claims and payments. See J.A. 44-47 (Oct. 3, 2000 Aff. of Scott Adams); J.A. 64-66 (Oct. 24, 2000 Aff. of Scott Adams); J.A. 87-91 (Nov. 8, 2000 Letter from Terry L. Stoltz to the district court); J.A. 133-34 (Tr. of Dec. 20, 2000 Hearing); J.A. 135-36 (Jan. 5, 2001 Letter from Terry L. Stoltz to the district court); J.A. 137-38 (Jan. 22, 2001 Letter from Terry L. Stoltz to the district court). Furthermore, most of these communications came in response to specific requests from the district court for more information. See J.A. 87, 134, 135, 137. Thus, the record demonstrates that the district court not only made it clear to Sureties that it considered such information significant, but also indicated to Sureties that it was willing to permit Sureties to make supplemental filings to support their motion to intervene. See, e.g., J.A. 134 ("If you would [provide a supplemental affidavit] that would be very helpful."). Even more, the district court did consider Sureties' supplemental filings when it decided their motion; the court specifically cited Sureties' last claims-status update when the court denied the motion to intervene. See Hayes v. Big Red Boat II, 2002 WL 1163555, at *4 n. 4 (citing "Sureties Letter dated January 22, 2001"). Therefore, we find no merit in Sureties' argument that the district court improperly denied them the opportunity to supplement their initial filings.
 
 
 [4]
 See, supra, note 3.
 
 
 [5]
 Sureties' contention that they were sure to have to pay some claims is undercut by the fact that at least one court has held, albeit after the district court denied Sureties motion, that credit card companies that refunded passenger deposits were unable to make claims for reimbursement under the FMC BondSee Nova Information Systems, Inc. v. Greenwich Insurance Co., 2003 A.M.C. 231 (M.D.Fla.2002). According to Sureties, approximately 82% of the passenger deposits made to Premier at the time it ceased operations that are attributable to BRBII were paid by credit card companies. See Intervenors'-Pls.'-Appellants' Br. at 20.
 Interestingly, this case also appears to explain, at least to some degree, why it took Sureties so long to pay any claims. Apparently they were using their own slow pace of claims investigation and payment as a way to encourage passengers to pursue effective reimbursement from their credit card companies. See Nova Information Sys., 2003 A.M.C. at 237-38 (recounting how Sureties issued public statements informing potential claimants that they would be "well advised" to seek reimbursement from a credit card company, if possible, in order to "avoid the delays that will inevitably occur in the investigation and claims settling process").